**UNITED BANANA COMPANY, Inc.,**
Plaintiff,

v.

**UNITED FRUIT COMPANY and Fruit
Dispatch Company, Defendants.**

Civ. No. 7487.

United States District Court
D. Connecticut.

July 23, 1965.

Robert E. Nickerson, Ivey, Barnum, O'Mara & Nickerson, Ernest Leff, Greenwich, Conn., for plaintiff.

John D. Fassett, Wiggin & Dana, New Haven, Conn., Thomas P. Griesa, Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, Stanley R. Mills, Jr., Boston, Mass., for defendants.

CLARIE, District Judge.

This action for treble damages, costs of suit and counsel fees was brought in three interrelated counts, pursuant to the laws of the United States commonly referred to as the Anti-Trust and Price Discrimination Acts, 15 U.S.C. §§ 1–27. The first count alleges that during the period January 1, 1958 through August 31, 1958, the defendants conspired with Thomas Kalliches, Inc., and others, to violate §§ 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1, 2. The plaintiff claimed that said conspiracy was designed to fix the price, the quantity and variety of inedible green bananas, which the plaintiff purchased during said period. It further alleged that the defendants monopolized and attempted to monopolize and conspire with each other and with others, to monopolize the import banana market in the Eastern Division Area of Fruit Dispatch Company, and, in particular, in the State of Connecticut.

The second count, after reiterating all the allegations of the first, claimed that the defendants assessed the plaintiff ten cents (10¢) per hundredweight as a service charge for the loading of plaintiff's banana trucks at the wharfside loading pier in Weehawken, New Jersey; while at the same time the defendants loaded the railway cars for other banana jobbers who were competitors of the plaintiff, free of any loading charge. It claimed alternatively to

the first count that this practice constituted an illegal price discrimination in violation of 15 U.S.C. § 13(e).

The final count, after reiterating and adopting the allegations of the first two, claimed that the defendants had sold the identical kind and quality of bananas on the same dates to plaintiff's competitors, to customers of the defendants whose customers competed with the plaintiff, and to plaintiff's own customers, at prices which were lower than those charged to the plaintiff, in violation of 15 U.S.C. § 13(a).

The damages sought to be recovered in this action may be categorized in three distinct groupings. The first alleges monopoly price overcharges; the second, discriminatory handling charges, and the third, discriminatory prices. The thrust of proof in the monopoly overcharges seeks to prove the difference between the average wholesale price of green bananas charged by the defendants during the controverted period, as against comparable charges for the same period by the defendants' largest import competitor. While the plaintiff originally alleged an average variance of One Dollar ($1.00) per hundredweight, this figure was modified at the trial to a differential of eighty-six cents (86¢) per hundredweight. This unit variance multiplied by the total product poundage purchased from the defendants by the plaintiff during the controverted period is utilized to establish the basis for the claim. The plaintiff's records indicated that its total purchases amounted to 2,590,948 pounds, with resulting damages of $25,909.48. However, plaintiff's requested findings of fact, which are based on defendants' records of purchase, rather than its own, amount to 2,458,660 pounds. The amended differential of eighty-six cents (86¢) per hundredweight, thus projects plaintiff's corrected claimed net loss to be $21,144.48. Using the defendants' same purchase figure, the plaintiff's claims of discriminatory illegal service charges amount to $2,458.66.

The third category, direct price discrimination, calculates what the plaintiff's savings would have been had the defendants charged to it the lowest price charged to any of the others of defendants' competitor banana jobber customers during said period. Its computation of this amounted to $7,805.55; this figure was claimed alternatively to have proven under the Sherman Act conspiracy or the Robinson-Patman Act discrimination. Thus, the total amount of damages which the plaintiff requested the Court to find and treble, amounted to $31,408.69, plus the costs of the action and a reasonable allowance for attorneys' fees.

## DESCRIPTION OF PARTIES

The plaintiff, United Banana Company, Inc., a Connecticut corporation, is a family operation, principally owned by Stanley Zebroski, and engaged in the banana jobbing business in the City of Stamford, Connecticut. It was originally formed in 1937 when the latter, who was then sole owner of the Stamford Banana Company, merged it with a similar business operated in that city by Charles Lecouras and Thomas Sakellares. In 1956 Zebroski acquired sole ownership by the purchase of all of the stock of his associates.

This jobbing business involved the purchase of green bananas from the importer at dock-side, transporting them to a banana ripening warehouse, removing the hands of ripened bananas from the stems and packaging them for delivery to retail food outlets. In 1958 the plaintiff's premises consisted of a building eighty feet by eighty in Stamford, Connecticut, which was utilized as an office, ripening room, work area and garage. It owned one large truck with a carrying capacity of about 18,000 pounds, used for picking up bananas at the pier in the port of New York and transporting them to Stamford, and three or four smaller trucks for deliveries to retail outlets.

During this period, the plaintiff serviced retail outlets on the following

three routes: (1) one route commenced in Stamford and proceeded down the shoreline to Fairfield, Westport, Darien and Norwalk; (2) a second commenced in Stamford covering most of the city and party of Greenwich; (3) and the third started in Stamford, covering part of Greenwich, Portchester, New York, Rye, New York, and then south into the City of New York.

The defendant, United Fruit Company, a New Jersey corporation, had its principal office outside the State of Connecticut. It operated a number of subsidiary corporations for the growing of bananas in various Central and South American countries and maintained a fleet of ships to transport their product to the consumer market areas. It is conceded by all parties that bananas are not grown commercially in the United States and are available only by importation.

The co-defendant, Fruit Dispatch Company, a subsidiary of United Fruit Company, is a Delaware corporation, and is engaged solely in the business of selling bananas as the exclusive agent of the United Fruit Company in the United States. This service is performed pursuant to a sales agreement between the parties,[1] wherein Fruit Dispatch is named as the sole general sales agent and distributor of United Fruit, authorized to sell and distribute its bananas throughout the United States and Canada.

The sales operations of Fruit Dispatch were divided into geographical areas known as the Eastern, Southern and Western Divisions. The Eastern Division Office of Fruit Dispatch was at all times primarily concerned with the pricing[2] and distributing of fruit arriving at the ports of New York or Baltimore. This area division office administered and supervised thirteen branch offices throughout Northeastern United States. These included: Baltimore, Boston, Buffalo, Charleston, West Virginia, Cleveland, Columbia, Detroit, New York, Philadelphia, Pittsburg, Syracuse and Scranton.[3]

The New York Branch Office, as distinguished from the New York Eastern Division Office, had within its sales territory an area which included New York City proper; thence north along the Connecticut State boundary to Poughkeepsie; thence in a general westerly direction to Monticello and Middletown, New York; and thence south as far as Trenton, New Jersey. The Hartford Branch Office supervised the area which included the State of Connecticut and a small area around Springfield, Massachusetts.

During the period in controversy, the defendants' major competitors in the business of importing green bananas were: Standard Fruit and Steamship Company; R. Dixon Company; Banana Distributors Company; Andes Fruit and Steamship Company; West Indies Importing Company; West India Fruit and Steamship Company; Louis Kuntz, and Gargula and Amendola. The largest of these was Standard Fruit and Steamship Company.

## FACTS

During this period, the plaintiff purchased practically all of the bananas required for the conduct of its business through Thomas Kalliches, Inc., a banana broker licensed pursuant to the provisions of the Perishable Commodities Act, 7 U.S.C. § 499c. This broker had approximately twenty clients whom it serviced during 1958; and maintained an office, but no storage or ripening rooms. Thomas Kalliches, Inc., is not a defendant in this action, but it is alleged to have been a conspirator with the defendants, in the accomplishment of their illegal purposes. At that time, a man by the name of Cos Masters was president of the broker corporation and the latter maintained its place of business in Richmond Hill, New York, adja-

1. Plaintiff's Exhibit T.

2. Tr. 2053.

3. Tr. 2051.

cent to Long Island Banana Company, an independent banana jobber, in which Masters held a substantial financial interest and of which he was the executive head. This broker solicited orders from jobbers in the States of Connecticut, New Jersey, and New York, provided professional market advice to its clients, and negotiated and processed claims and adjustments for defective product. In return for this service, it received a commission which varied according to the principals it represented, and the circumstances and services rendered.

While many jobbers bought directly from the importers and thus eliminated paying any commission, the plaintiff authorized and appointed this broker as its agent to purchase its required needs for bananas.[4] The plaintiff agreed to pay currently a five percent (5%) commission on the total of the invoice price of the fruit plus wharfage. At the end of the calendar year, the plaintiff received a rebate of approximately two percent (2%). Out of the total five percent (5%) commission, Kalliches paid and deducted from the over-all commission the premium on a key-man or credit life insurance policy on Stanley Zebroski, the plaintiff's principal officer and stockholder, under an agreement that if he should die while the plaintiff corporation was indebted to the broker, the proceeds would be used to satisfy such debt.

The broker exercised its own discretion in making purchases from any importer of its choice, but for the most part it did the great majority of its business with the defendant, Fruit Dispatch. The broker also represented several other Connecticut jobbers on a brokerage commission agent basis. They included: Mansi, of New Haven; Peter Sakellares, dba Danbury Banana Company, and Thomas Sakellares, of Danbury; Cionciola, of Torrington, and Parnon, of Waterbury.

All sales made by Fruit Dispatch to the plaintiff were billed only to the broker, but each invoice contained the point of destination to which the bananas were to be shipped. Credit terms between the broker and the defendant, Fruit Dispatch, provided ten days from the date of shipment and the broker billed the plaintiff jobber accordingly. However, it was an acknowledged fact that the plaintiff was extended credit by the broker, Thomas Kalliches, Inc., for periods of thirty to sixty days, and in a few instances for a longer period. It was generally known by all parties that the broker did not itself engage in the jobbing business nor did it take deliveries or warehouse or process fruit. Whatever purchases Kalliches made from Fruit Dispatch, it was understood that it was only acting as a licensed commission broker; it was not purchasing the commodity to resell in the ordinary course of trade or acting in any other capacity.

The primary sources of bananas are Central America, Ecuador, Columbia, and a limited supply from certain islands in the Caribbean. The two general varieties which have commercial recognition in the United States are Gros Michel and Cavendish. The former has been the more acceptable in the American market because it maintains its appearance for consumer demand. United Fruit Company not only owned, developed, and operated numerous banana plantations in Central America, but in addition purchased some Gros Michel fruit from Ecuador during the four months of the year when this variety was of prime quality.[5] This latter grouping was known as Pacific or Ecuadorian fruit.

### PRICING

During the period within which this case is concerned, overall approximately 125 vessels of United Fruit unloaded banana cargoes in the Port of New York at an average of three to four vessels each week. It was imperative that each ship be discharged promptly upon arrival, because of the perishability of the cargo and also in order to maintain

---

4. Tr. 447–449; Plaintiff's Exhibit I.

5. Tr. 1751–1752.

shipment schedules. Approximately one week before each vessel arrived, the president of Fruit Dispatch would be advised by United Fruit of the name of the vessel, the arrival date, the variety in fruit cargo, and an estimate of the number of stems carried. Usually on Friday, the Eastern Division sales manager conferred with the president of the defendant, Fruit Dispatch, to determine the seaboard price for the anticipated arrival of each shipload of fruit.[6] In establishing the seaboard price, the officers took into consideration, among other factors, the volume of arrivals of comparable fruit at the port. They also considered the competition of other fresh fruits in season, together with market consumption experience data, which might permit them to estimate potential consumer demand for bananas. When it had been agreed what the seaboard or asking price would be, all branch offices within the Division were notified to commence soliciting orders for the fruit arriving the following week. The seaboard price was generally applicable to all branches within the Division and the record discloses that during the period in question, the seaboard price for the New York branch market area and the Connecticut branch market area was the same. When these prices were established, the asking price for specials and turnings was also set. It was generally known through inspection on the vessel and ship-to-shore communication with the terminal port, what the percentage of reject fruit would be aboard at the time of arrival and the amounts of each class available. All branches telephoned orders into the Eastern Division Office, except the New York Branch; the latter recorded all of its orders on a separate worksheet of its own. Both the Eastern Division Office and the branch office at New York City were located adjoining one another on the same pier, and although each maintained separate office entities, they were so physically located and coordinated, they were substantially one.

Each branch office of Fruit Dispatch was restricted to selling fruit to destinations within its own predetermined geographical territory. The plaintiff's broker, Kalliches, placed all its orders which had New York and New Jersey destinations with the New York Branch Office; however, the latter would not accept orders for a Connecticut delivery destination; these normally would be placed with the Hartford Branch Office. However, as an accommodation or convenience to this broker, because its sales office was in New York City, the Eastern Division Office of Fruit Dispatch, rather than the Hartford Branch Office, agreed to solicit and accept all orders from Kalliches, which bore a Connecticut destination.[7] Thus, when Fruit Dispatch solicited orders from Kalliches, the latter was contacted by not only the New York Branch Office (for its New York and New Jersey client bookings) but also the Eastern Division Office (for its Connecticut client bookings). At no time was there any difference in the "seaboard price" quoted on fruit by the New York or Connecticut Branch Offices.[8] Throughout the period, the plaintiff usually placed its orders with the broker on Friday for the entire following week. It was its custom to order only the prime quality and best varieties, because the Connecticut market provided no demand for reject fruit.[9] It was also plaintiff's custom to request that the broker make arrangements for an early morning pickup of its fruit by its own truck or truck carrier.

Excepting during known periods of the year when bananas were in short supply, it was usual for vessels to arrive in port without orders having been placed for all of their cargo. While sales efforts continued during the ship's unloading process, it was often necessary to reduce the asking price during the unloading process below the original "seaboard price." Sometimes this occurred because of the weather conditions, the cheap sea-

---

6. Tr. 2456–2459.

7. Tr. 1166; Plaintiff's Exhibit W.

8. Tr. 886, 996, 1332, 1434.

9. Tr. 154, 225, 1199.

sonal supply of competitive fresh fruit, other than bananas; or an over abundant supply of bananas arriving in the port at the same time as that of competitors.

Any downward price changes were designed to increase the demand for the commodity and bring the defendants' price in line with the current market conditions. The decision to make a price reduction was that of the division manager, and no branch manager could vary it without specific authorization. The division office notified all branches within its territory of any price changes and the customers were then resolicited at the reduced prices. Those who had placed orders prior to the reduction were always given the benefit of it, even though delivery had been consummated.

By agreement with Fruit Dispatch, the New York Central Railroad maintained refrigeration type cars on call at the wharf-terminal. These were loaded with fruit which had not already been sold at the time of the cargo's discharge and permitted the boat a minimum of delay in port. These refrigerated cars of unsold surplus fruit were commonly known in the trade as "rollers." While Fruit Dispatch attempted to sell these rollers for the same price as it received for other fruit delivered during the vessel's discharge, this was not usually possible. It was common knowledge in the trade that when rollers were available, they could be bought at a price below "seaboard." This price reduction was essential to secure a sufficient volume of purchasers. It was also trade knowledge that a jobber who purchased these rollers and utilized truck transportation was required to pay additional expenses to unload the fruit from the refrigerator cars which had been moved to the railroad team-track siding. It not only required paying additional handling charges, but ultimately marketing a product which was ripening, and the appearance and marketability of which was becoming progressively impaired by additional handling.

Thus, any savings on the decreased price benefits from rollers, must be weighed against the increased handling charges and the effect such handling ultimately had on the appearance and marketability of the fruit. Fruit which was not disposed of on the team-track was then rolled out by rail; the several branch offices were notified of the number of cars available and the asking price, so that the branch managers might procure purchasers. These rollers were thus distributed at a forcibly reduced market price, controlled by the basic economic law of supply and demand.

During the entire eight-month period out of an approximate total of 173 business days, surplus rollers were available only on thirty-two days.[10] On twenty specific dates, out of the total of thirty-two, the plaintiff has alleged price discrimination, because on those occasions rollers were sold to the plaintiff's competitors and not made available to the plaintiff. On the two single occasions when competitors did receive bananas at a price less than the seaboard price paid by the plaintiff, on March 25, 1958 and August 18, 1958, the defendants maintain that the descending market was caused by tangible economic pressures, generated in an open competitive market in the New York metropolitan area.

A second phase of the plaintiff's claim is addressed to the truck loading or wharfage charge of ten cents (10¢) per hundredweight which was assessed by Fruit Dispatch against the plaintiff and all others who loaded their trucks at the Weehawken terminal. It is its contention that this constituted an indirect price discrimination, because the defendant did not make such an assessment in the loading of the railroad cars which could be ordered by those jobbers who enjoyed railroad siding facilities at their warehouse processing plant. The plaintiff did not have a warehouse siding available to it and thus could not avail itself of this mode of delivery.

---

10. Tr. 2402; Defendants' Exhibits 52A and 52B.

## AGENCY

The defendant, Fruit Dispatch Company, was a wholly owned subsidiary of the defendant, United Fruit Company. It acted as the duly authorized agent of United Fruit Company for the sale of all of its imported bananas into the United States.[11]

Its authority was very broad and included the right to handle, distribute, and sell United Fruit bananas for such prices, to such persons, and in such manner, as it might deem to be for the best interests of United Fruit. The parties stipulated that during the year 1958, a sales agreement was in effect between Fruit Dispatch Company and its parent company, United Fruit Company.[12] For the purposes of this action, this Court considers United Fruit Company to be bound in all respects as the principal, by the actions and conducts of its sales representative, Fruit Dispatch Company, acting pursuant to said contract.[13]

■ In order for the plaintiff's claim to have legal merit under the Clayton and the Robinson-Patman Acts, 15 U.S.C. § 13(a), it must be proven that it is an actual purchaser from the defendants before discrimination can be charged.

"The decisions of many cases have crystallized the rule that an individual can have no cause of action under Section 2(a) of the Clayton Act unless he is an actual purchaser from the person charged with the discrimination." Klein v. Lionel Corporation, 237 F.2d 13, 14–15 (3 Cir. 1956).

■ On July 22, 1946, Kalliches was authorized by United Banana Company, the plaintiff's predecessor (a partnership), to be its agent and broker to purchase bananas from the importer; and after the business was incorporated, the same practice and relationship continued through 1958.[14] The broker was duly licensed by the Government to perform such a service [15] and both the defendants and the plaintiff recognized its fiduciary function in their dealings over an extended period of time.[16] It was in reality a marketing information and purchasing advisory service provided to jobbers for a specific commission. No contracts existed between the broker and either of the defendants. See Oliver Bros. v. Federal Trade Commission, 102 F.2d 763, 770 (4 Cir.1939). It neither purchased nor processed fruit for its own use; it was understood that the cancellation of an order for fruit by a jobber meant cancellation of that order by the broker. The broker never changed the price it paid to the importer or dealt in the product, it only added an agreed commission for its service. It never accepted delivery or took possession itself; it arranged only for delivery to those buyers whose identity and address were disclosed to the seller.[17] The broker, Thomas Kalliches, Inc., certainly cannot be classified as a consumer; it was a middleman not eligible to claim injury. Freedman v. Philadelphia Terminals Auction Co., 301 F.2d 830, 833 (3 Cir. 1962). The methods of invoicing and the extension of credit terms did not destroy the broker's limited agency to make these purchases. The plaintiff is therefor a purchaser within the provisions of 15 U.S.C. § 13(a).

## MONOPOLY AND PRICE DISCRIMINATION

The plaintiff claims that the defendants, together with certain non-defendants,[18] including Canadian Banana Company, Limited, and Thomas Kalliches, Inc., monopolized and conspired to monopolize the production and distribution of quality green bananas in the United States; and more particularly, in the

---

11. Tr. 2049–2054; Plaintiff's Exhibit T.

12. Tr. 523–525.

13. Supra note 11.

14. Tr. 4–5, 21–22, 30–32, 88, 91–93, 95–96, 104–105, 162, 177–178, 447–449; Plaintiff's Exhibit I.

15. Tr. 1026–1028, 2134–2135.

16. Tr. 1029–1038.

17. Tr. 816–818, 1028–1030.

18. American Banana Company; K & M Banana Company; Mouyious & Co.; See Complaint, First Count, par. 28.

Eastern Division and the Connecticut Market Area during the period from January 1, 1958 through August 31, 1958. It represents further, that the defendants so conducted their business as to constitute a conspiracy in restraint of trade to the injury of the public; that they did advance their monopolistic objectives in unlawful ways, and abused their control of the industry so as to artificially raise and maintain prices; and that they did discriminate against the plaintiff, all to the injury of the public.

The defendants, in addition to denying all of the plaintiff's allegations of unlawful conduct, pleaded several affirmative defenses. They asserted that their admitted position of dominance in the industry was a natural consequence of their superior ability and efficiency; and that the truck loading fee of ten cents (10¢) per hundredweight additional had been included in an approved tariff by the Interstate Commerce Commission, and actually constituted an overall lower rate by truck than by railroad car. They claim further that this preferred position in the industry resulted from conditions which normally developed from economic forces beyond their control. Differences in prices to individual customers occurred as a result of changing conditions affecting the market or the diminished marketability of the product due to its inherent perishable nature. Any other price differences which may have occurred were made in good faith, to meet the equally low prices of competitors.

The Court in evaluating the merits of the plaintiff's allegations must necessarily determine whether or not the defendants exercised monopolistic control over the banana trade as prohibited by 15 U.S.C. §§ 1 and 2; and if so, whether such power was misused, so as to cause an unreasonable restraint of interstate commerce.

"Section 1 covers contracts, combinations, or conspiracies in restraint of trade.[19] Section 2 is not restricted to conspiracies or combinations to monopolize[20] but also makes it a crime for any person to monopolize or to attempt to monopolize any part of interstate or foreign trade or commerce. So it is that monopoly power, whether lawfully or unlawfully acquired, may itself constitute an evil and stand condemned under § 2 even though it remain unexercised. For § 2 of the Act is aimed, inter alia, at the acquisition or retention of effective market control. * * * Hence the existence of power 'to exclude competition when it is desired to do so' is itself a violation of § 2, provided it is coupled with the purpose or intent to exercise that power. * * (T)he use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." United States v. Griffith, 334 U.S. 100, 106–107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

"Monopolizing within the act is the appropriation of a trade by means of contracts, combinations or conspiracies in restraint of trade or other unlawful or tortious acts, whereby 'the subject in general is restrained from that liberty of * * trading which he had before.' In the absence of such means or agencies of exclusion, size, aggregated capital, power, and volume of business are not monopolizing in the legal sense. * * *

"The acquisition of existing plants or properties however extensive,

---

19. 15 U.S.C. § 1 provides in part:
"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal:"

20. 15 U.S.C. § 2 provides in part:
"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations,"

though made to obtain their trade and eliminate their competition, is not a monopoly at common law or monopolizing under the Sherman Act, in the absence of the exclusion of others from the trade by conspiracies to that end or contracts in restraint of trade on an elaborate and effective scale, or other systematic, wrongful, tortious or illegal acts." Standard Oil Co. v. United States, 221 U.S. 1, 10–11, 31 S.Ct. 502, 55 L.Ed. 619 (1911). See United States v. American Tobacco Co., 221 U.S. 106, 179, 31 S.Ct. 632, 55 L.Ed. 663 (1911).

"A correct interpretation of the statute and of the authorities makes it the crime of monopolizing, under § 2 of the Sherman Act, for parties, * * * to combine or conspire to acquire or maintain the power to exclude competitors from any part of the trade or commerce among the several states or with foreign nations, provided they also have such a power that they are able, as a group, to exclude actual or potential competition from the field and provided that they have the intent and purpose to exercise that power." American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

In considering first the plaintiff's allegations related to the monopoly issue, it is important to consider the statistics which relate to the importation of this commodity during the controversial period. The total importations of green bananas into the United States and Canada during the first eight months of 1958 were 3,686,000,000 pounds; of this amount, United Fruit imported 2,232,000,000 pounds. These facts demonstrate that United Fruit through its sales agency, Fruit Dispatch, sold and distributed 60.5% of this product in the foregoing market.

■ In similar manner, the total imports of this fruit into the Eastern Division of Fruit Dispatch were 13,847,632 stems or bunches.[21] Of this total, 9,247,959 stems or bunches were imported into the Eastern Division Area through the defendant, Fruit Dispatch. These figures demonstrate that 66.6% of all stems imported into Eastern Division during the period in controversy were imported and distributed by said defendant. The plaintiff would have the Court increase this percentage by excluding the Cavendish banana on the grounds that it possesses characteristics which plaintiff claims make it inferior and less marketable. The overall market, however, does not support this contention; particularly, in those months when the condition of Cavendish fruit is prime.

■ During this same period, the total imports of bananas into Connecticut amounted to 43,197,000 pounds. Of this total, 30,303,000 pounds or 70.15% was imported by Fruit Dispatch; the remainder was imported by its competitors.[22] Conceding that the foregoing import statistics are substantially correct, the mere economic magnitude of the defendants and their dominance of the import banana market is not sufficient alone for the Court to conclude that the defendants are in violation of the Sherman Act. It must be shown, in addition, that its economic position of power is coupled with the purpose or intent to use it to foreclose or destroy competition or gain an unfair competitive advantage. United States v. Griffith, supra. In other words, there must exist not only the power to produce the result which the law condemns but also the intent to exercise that power. Swift & Company v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905). It is apparent and the Court so finds, that the defendants did have the economic strength and power to dominate and effectively influence the banana import market during the period in controversy. The issue then focuses on the question of whether or not, by their conduct, the defendants attempted to exclude

21. Plaintiff's Exhibit G, 1–35.

22. Tr. 1443; Plaintiff's Exhibit H.

others from the trade by conspiracies, contracts, or other wrongful, tortious or illegal acts.

During the first quarter of 1958, the plaintiff purchased from Fruit Dispatch, through its broker, 77.02% of all of its bananas; it also purchased through said broker 14.63% of its purchases through sources other than Fruit Dispatch, and 7.42% of its purchases from Ecuadorian Fruit. During this same period, the plaintiff's gross profit margin was 53.3%. During this period, 78.67% of its banana sales were to the A & P. Its net profit for this first quarter was $16,194.16.[23]

In the second quarter of 1958, the plaintiff purchased through its broker, from Fruit Dispatch, 89.26% of its bananas; it also purchased through said broker, 4.43% of its purchases from other sources than Fruit Dispatch; and it purchased 6.31% of its bananas from Ecuadorian Fruit. During this second quarter, the plaintiff's margin of gross profits was 51.05%; 72.25% of its sales during said period, were made to A & P. The net profit for the second quarter amounted to $2,955.12. This made a total net profit for the first six months of 1958 of $19,149.28.[24]

During the first two months of the third quarter of 1958, the plaintiff purchased through its broker, from Fruit Dispatch, 66.25% of its bananas; it purchased 10.28% through said broker from sources other than Fruit Dispatch; and it purchased 23.47% from Ecuadorian Fruit. During July and August of the third quarter, its gross margin of profit was 48.48%. During this period, 49.29% of its product was sold to the A & P. In the three-month period of the third quarter, the plaintiff suffered a net loss of $6,126.54.[25] It is significant to note that during this third quarter period when the plaintiff did experience a substantial loss of profits, it purchased one-third of its bananas from a source other than the defendants. While this loss may be attributed to the diminished volume of plaintiff's sales, caused by A & P opening its own ripening warehouse in Elmsford, New York, during the latter part of the third quarter, it is significant to note that especially in the first quarter, as well as in the second quarter of that year, the plaintiff experienced operational profits. The plaintiff specifically represented that it made no claim that its loss of A & P as a customer could be attributed to its inability to meet competitive prices.[26]

Another aspect of the plaintiff's claim was that it was denied an adequate supply of bananas the year round to service its trade. When there was short supply, the defendants admitted that it was the business practice of Fruit Dispatch to allocate fruit on the basis of the amount of purchases by the customer during the previous six-month period.[27] In other words, the higher the volume of purchases made, the greater the percentage of allotment to the customer during the periods of short supply. In the case of the plaintiff, it was customary for the defendant, Fruit Dispatch, to group the Connecticut jobbers for whom the broker, Kalliches, acted as purchasing agent, from the customers who were served directly by its Hartford Branch Office. The broker's purchases for its Connecticut jobbers during the six-month period formed the basis for the broker's overall allotment during periods of scarcity. Discretion as to the breakdown of the allotment among the latter's several Connecticut principals was left within the broker's sole discretion.[28]

█ The plaintiff claimed that because surplus rollers had been denied to it by Fruit Dispatch in the Connecticut area market as a matter of policy, its gross purchases were thereby diminished. Thus, proportionately its quota of bananas during periods of short supply were materially reduced, based upon the foregoing allotment policy and the

23. Defendants' Exhibit 39.

24. Defendants' Exhibit 38.

25. Defendants' Exhibits 8 and 38.

26. Tr. 2032–2035.

27. Tr. 2059, 2676–2677.

28. Tr. 557–558, 1193, 1220.

plaintiff was thus discriminated against. There is no merit to plaintiff's claim that this allotment policy was unfair or discriminatory.

During the period in controversy, surplus rollers were in fact sold and distributed in the Connecticut market area on February 15, April 4, April 8, and August 18; and they were also available in this geographical area to the plaintiff's broker and agent on other dates during said period, but there was no demand for them.[29]

> "The evil at which the Robinson-Patman Act is aimed is discrimination between different competing purchasers, where the effect of such discrimination may be substantially to lessen competition or to tend toward a monopoly in commerce." Hartley & Parker, Inc. v. Florida Beverage Corporation, 307 F.2d 916, 921 (5 Cir. 1962); Jones v. Metzger Dairies, Inc., 334 F.2d 919, 924 (5 Cir. 1964).

The plaintiff's president claimed that its broker's office manager, Mr. Kaplan, had been advised to let him know when there was any cheap first class fruit available (rollers). Kaplan claimed that he had been turned down several times by the defendants' Eastern Division manager, after having made such a request, so he gave up trying. Except for the lowered price of rollers, Kaplan denied that he had ever told the plaintiff that there were two prices, a New York market price and a Connecticut market price. The plaintiff had relied upon Kaplan as the factual source of this inequity of which it complained.

The defendants did concede that all branches were not solicited on all occasions when rollers were available. However, on no occasion were rollers solicited from some customers in a branch area, unless an attempt was made to contact all customers in each branch market area.[30] The defendant, Fruit Dispatch, represented that the Hartford area contained limited consumer potential and the market could be easily glutted, saturated, and destroyed for purposes of orderly consumption and stable prices.[31] For this reason, the Connecticut territorial area was not always solicited when rollers existed.[32]

■ The basic question is whether or not a national fresh fruit distributor, such as Fruit Dispatch, may set up separate and distinct sales zones or territories for the sale and distribution of its production in such a manner that market policies might be varied to meet local situations. Such procedure is permissible, but one of the essential legal requirements is that the area designation shall be reasonable and not arbitrary, so that the alignment of the marketing area shall not cause the destruction of free and open competition.

In this respect the plaintiff claims that its regular business caused it to sell to retail outlets in New York State;[33] while competitor jobbers, whose warehouses were located in New York State,[34] came across the Connecticut State line and sold to Connecticut retailers who were customers of the plaintiff. Thus, plaintiff claims that the defendants' designation of market zones, based on a geographical state line, is a false and mythical market delineation for purposes of evaluating competitive factors in this instance and did constitute discriminatory pricing, as well as cause discrimination by the denial of surplus roller fruit.

The factual circumstances that the location of plaintiff's business at Stamford was close to the New York State line; or that some of its distribution routes took it into that State; or that some of its competitive New York jobbers distributed to retailers in Connecticut is not

---

29. Tr. 730, 834, 1175, 1374, 1380, 1401–1402, 2178–2179, 2191–2192, 2379, 2381, 2395, 2399; Defendants' Exhibit 55.

30. Tr. 2403, 2424.

31. Tr. 2405.

32. Supra note 30.

33. Plaintiff's Answer to Interrogatory 7.

34. Plaintiff's Answer to Interrogatory 4K, 1–10.

adequate reason for the Court to intervene and declare that the market zone area was unreasonable, arbitrary and discriminatory. As long as all competitors located in the same market zone were treated equally and not discriminated against, there is no justification in this instance to claim unlawful conduct. It is not within the purview of this Court to suggest the means by which the plaintiff might well have adjusted its business operations, so as to conform and benefit from the defendants' marketing pattern. In any event, the conditions which were existent here did not require Fruit Dispatch to declare the New York and Connecticut Market area one territory for marketing purposes. Wherever marketing zones are established, border areas most always would chafe under variances required to cope with special existing local conditions.

The seaboard price established by the Eastern Division Office was the same, both for the Hartford and New York area.[35] On only two occasions during the twenty-two days of the eight-month period, wherein price variance or discrimination is claimed, April 11, 1958 and August 18, 1958, did the Hartford and New York prices for regular market fruit vary and this was attributed to the normal pressures of free competition, exerted in particular on this occasion by Standard Fruit and Steamship Company.

"There is, on the other hand, plain language and established practice which permits a seller, through § 2 (b), [(15 U.S.C. § 13(a))] to retain a customer by realistically meeting in good faith the price offered to that customer, without necessarily changing the seller's price to its other customers." Standard Oil Co. v. Federal Trade Comm'n, 340 U.S. 231, 250, 71 S.Ct. 240, 95 L.Ed. 239 (1951).

On both of these dates, the reduction in price was made to meet the lowered price of competition. In fact, on April 11, 1958, the Connecticut jobber's price was lower than that of the New York Branch; on August 18, 1958, the situation was reversed, the New York price was less than the Hartford, Connecticut Branch.[36]

---

35. Supra note 8.

36. *Twenty-two trade dates on which plaintiff claims discrimination:*
*January 28*—Plaintiff purchased 1 truckload of bananas at $7.50 cwt., while American Banana Company and Markantes each purchased a carload at $6.50 cwt. The bananas purchased at the lesser price were surplus freight-car loads sold as rollers and in addition contained stems or bunches classified as 8-hands or 8's, rather than 9's, a superior fruit which had been purchased by the plaintiff. (Tr. 2210–2213).
*January 31*—Plaintiff purchased 2 truckloads at $7.50 cwt., while American Banana Company, Mouyios, and K & M each purchased freight cars at $6.00 cwt. It should be noted, however, that American Banana purchased a truckload of the same fruit earlier in the day from the same vessel at $7.50 cwt; Mouyios purchased 4 trucks at $7.50 cwt., and K & M had purchased 1 truck at $7.50 cwt. and 1 rail car of turnings at $6.-00 cwt. All of the $6.00 cwt. cars mentioned above, were surplus fruit classified as rollers. (Tr. 2213–2217).

*February 4*—Plaintiff purchased 1 truckload at $6.50 cwt.; American Banana purchased 3 at $5.00 cwt.; Mouyios and Markantes each purchased 1 car at $5.00 cwt. All of the cars at $5.00 cwt. were rollers. The same date, American Banana bought 1 car of specials at $4.00 cwt. Markantes purchased 1 load of comparable select fruit as that of the plaintiff earlier that same date at $6.50 cwt. Mouyios also had purchased 2 trucks at $6.50 cwt. (Tr. 2223–2228).
*February 7*—Plaintiff purchased 2 truckloads at $7.50 cwt.; American Banana purchased 3; Mouyios purchased 2; Markantes and K & M each purchased 1 carload at $6.00 cwt. All of the $6.00 cars were surplus. American Banana had purchased 2 trucks from the same vessel earlier that day for $7.50 cwt. as did the plaintiff; Mouyios also purchased 2 trucks from the same vessel at $7.50 cwt. (Tr. 2228–2232).
*February 12*—Plaintiff purchased 2 truckloads at $6.00; American Banana purchased 3 truckloads, K & M 2, and Mouyios 1, each at $4.50 cwt. All of these $4.50 cwt. rail cars were surplus rollers. Earlier the same day, Ameri-

"It is obvious that \* \* \* by selling ice cream products in the Los Angeles area at a lower price than it charged for like products in other

can had purchased 1 truckload and Mouyios had purchased 2 truckloads at $6.00 cwt., as had the plaintiff. (Tr. 2232-2236).

*February 14*—Plaintiff purchased 3 truckloads at $6.50 cwt.; Kalliches (Mansi-New Haven) purchased 1 rail car at $5.50 cwt.; and Markantes and K & M each purchased rollers at $5.50 cwt. Defendants' Exhibit 19 and Plaintiff's Exhibit O do not reflect the correct data, which is disclosed in the transcript. All of the lower prices were surplus fruit and sold as rollers. (Tr. 2236-2239).

*February 20*—Plaintiff purchased 2 truckloads at $5.00 cwt.; American Banana 2 roller cars at $4.00; the latter had earlier on that same date purchased 2 truckloads at $5.00 and a car of mixed turnings at $3.00. The $4.00 cwt. cars were both rollers. (Tr. 2239-2241).

*February 21*—Plaintiff purchased 3 truckloads of 9's, at $6.50 cwt; American Banana purchased 4⅔ truckloads at $5.50 cwt. and ⅓ truck at $5.00 cwt. K & M purchased 1 car at $5.50 cwt. All of the $5.50 cwt. cars and $5.00 cwt. cars were rollers. The $5.50 cwt. cars were 9's and the $5.00 cars were 8's. (Tr. 2241-2244).

*March 14*—Plaintiff purchased 1 truckload at $7.50 cwt.; American Banana purchased 1 car load at $5.50 cwt. This latter car consisted of 31 stems of broken bunches and 25 stems of pieces and was known as a remnant load. That is the final load taken off the ship and contains everything left over. In this case, it amounted to only 6000 pounds. (Tr. 2244-2253).

*March 18*—Plaintiff purchased 1 truckload at $7.50 cwt. American Banana purchased 5 rail cars at $6.00 cwt.; Markantes 1 car and K & M 2 cars, each at $6.00 cwt. These latter cars were all surplus fruit and sold as rollers. On the same day, A & P purchased 4 cars and 5 truckloads at $7.50 cwt. as had the plaintiff; and Safeway Stores also purchased 4 truckloads at $7.50 cwt. The latter two purchasers were identified as competitors of the plaintiff. (Tr. 2253-2258).

*March 25*—Plaintiff purchased 1 truckload of Fortuna 9's at seaboard price, $6.50 cwt.; American Banana 2 carloads at $5.50 cwt. and 6 carloads at $4.50 cwt., Yello-Ripe purchased 2 cars at $5.50 cwt.; Mouyios 1 car at $5.50 cwt; A & P purchased 2 truckloads at

$5.50 cwt.; Safeway 2 carloads at $5.50 cwt. This vessel contained different kinds of fruit. United Banana purchased Fortuna 9's; American Banana's 6 cars of rollers contained Guatemalan fruit, which is considered generally to be of lesser quality than Fortuna. The two truckloads purchased by A & P were first class Guatemalan fruit and were not rollers. Yello-Ripe, Mouyios, A & P, and Safeway purchased Fortuna 9's. The reason for the lower price experienced by the latter group on this particular day, was because Standard Steamship and other importers had vessels arriving at the same port at the same time and were selling their bananas at a cheaper price. United Fruit lowered its price in order to be competitive. Defendants' Exhibit 47, a diary of Fruit Dispatch, indicates a competitive pressure being felt only in the Metropolitan area. Confirmation of this condition is expressed in the factual price data of that day's business which indicates Standard was forced to sell rollers later that day at $3.50 cwt. and ultimately $2.50 cwt. The plaintiff's Connecticut price was not lowered because it was not in the Metropolitan trade area where competition was being felt. (Tr. 2258-2277).

*March 28*—Plaintiff purchased 1 truckload at $6.50 cwt.; American Banana, Mouyios, Markantes and K & M each purchased 1 rail car at $5.50 cwt. All of these latter cars were rollers. It is to be noted that Mouyios had purchased 3 truckloads from the same vessel earlier that day for $6.50 cwt., at the same price as the plaintiff. (Tr. 2278-2283).

*March 31*—Plaintiff purchased 1 truckload at $7.00 cwt.; American purchased 4½ carloads at $5.50 and ½ carload at $5.00; Mouyios, Markantes, and K & M each purchased 1 carload at $5.50 cwt. On this date, the plaintiff purchased Chiriqui fruit; all others herein mentioned, purchased Golfito fruit. Furthermore, the ½ car sold at $5.00 consisted of Golfito 8's rather than 9's. The Chiriqui fruit is generally regarded as superior to Golfito. (Tr. 2283-2290).

*April 4*—The plaintiff purchased 1 truckload of Chiriqui fruit at $7.00. American Banana purchased 6 carloads, Mouyios purchased 2 and K & M purchased 2, each at $5.00 cwt. All of these cars were surplus fruit and sold as rollers. Although defendants' Ex-

states, did not violate § 2(a) of the Clayton Act, as amended, 15 U.S.C.A. § 13(a).

" * * * Congress did not put a floor under all existing prices so these could never be lowered by a firm doing interstate business." Ba-

lian Ice Cream Co. v. Arden Farms Co., 231 F.2d 356, 366–367 (9 Cir. 1955); Federal Trade Comm'n v. Sun Oil Co., 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963).

The plaintiff failed to substantiate its burden that it was the subject

hibit 19 does not reflect it, American Banana paid $5.50 cwt. on that date for a truckload of broken bunches. (Tr. 2290–2292).

*April 7*—Plaintiff purchased 1 truckload at $7.00 cwt. American Banana purchased 3 carloads, Mouyios 2 carloads, and K & M 1 carload, each at $5.00 cwt. All of the rail carloads were surplus fruit and sold as rollers. Earlier on the same day, K & M purchased turnings for $5.00 cwt. (Tr. 2292–2294).

*April 8*—Plaintiff purchased 2 truckloads at $6.00 cwt. American Banana purchased 5 carloads, and Mouyios, Markantes and K & M each purchased 1 carload at $4.50 cwt. All of the rail carloads were surplus fruit sold as rollers. (Tr. 2294–2296).

*April 11*—Plaintiff purchased 1 truckload at $5.00 cwt. American Banana purchased 9 carloads and K & M 3 carloads, each at $4.50 cwt. Although it is not indicated on Defendants' Exhibit 19, Markantes and Mouyios each received 1 carload at $4.50 cwt. American Banana also bought 1 truckload at $6.00 cwt.; Yello-Ripe 1 truckload at $6.00 cwt.; Mouyios 3 truckloads at $6.00, and A & P 5 truckloads and 6 carloads, each at $6.00 cwt. On this date, the price in the Connecticut or Hartford Branch market was cheaper than New York. This was due to the fact that competitive pressure was being brought to bear in the Connecticut market by Standard Steamship imports and the defendants' price was lowered to meet it. There was no lowering of prices in the New York Branch area. All purchasers in the Hartford Branch Office area received the benefit of the lower price regardless of whether they had ordered before the price was lowered. (Tr. 2296–2306).

*April 15*—Plaintiff purchased 3 truckloads at $6.00 cwt. American Banana purchased 4 carloads, Mouyios 2 carloads, Markantes 1 carload and K & M 2 carloads, each at $4.50 cwt. All of the sale at $4.50 cwt. were surplus fruit sold as rollers. (Tr. 2326–2329).

*May 23*—Plaintiff purchased 1 truckload at $7.00; American Banana pur-

chased 7 carloads, Mouyios 1 carload and Markantes 2 carloads, each at $6.00 cwt. All of the fruit on this date was Guatemalan. The sales to American, Mouyios and Markantes were surplus rollers. (Tr. 2208–2210, 2339, 2478). The transcript indicates that only 5 carloads, instead of 7, went to American (Tr. 2330) and only 1 carload went to Markantes (Tr. 2332).

*August 8*—Plaintiff purchased 1 truckload at seaboard price, $10.00 cwt. American Banana purchased 1 carload at $6.00; 2 carloads at $7.00; Mouyios purchased 1 carload at $7.00 and 1 at $6.00; K & M purchased 1 carload at $7.00. All of the purchases made at less than seaboard price were surplus fruit and sold as rollers. A further distinction in the sale of surplus fruit between $7.00 cwt. and $6.00 cwt. occurred, because the cheaper fruit was purchased later in the day. The price of this surplus fruit is not static. When the fruit is not moving, the price is lowered to create a demand and to dispose of it. (Tr. 2335–2343).

*August 15*—Plaintiff purchased 1 truckload at the seaboard price of $8.00 cwt. American Banana purchased 4 carloads and Mouyios 1 carload at $5.50 each. All of the latter purchases were surplus fruit and sold as rollers. (Tr. 2343–2346).

*August 18*—Plaintiff purchased 1 truckload at seaboard price, $8.00 cwt. A & P purchased 6 carloads at $6.50 cwt. and Safeway 5 carloads at $6.50. The lower price here reflected the competitive pressure felt in the Metropolitan area on that date. Other importers were selling select greens at $5.00 and $6.00. (Tr. 2346–2351).

It is significant to note that plaintiff's competitors, A & P and Safeway Stores received no rollers on any of the 22 dates in question. On the two occasions when they did receive bananas at a price less than seaboard, during the eight-month period, namely March 25th and August 18th, it was due to the normal pressures generated in a competitive market in the New York Metropolitan area.

of price discrimination or monopoly discrimination; or that it was denied surplus roller fruit when such fruit was available to competitors in the same market area. There was no evidence that the plaintiff had on any specific occasion ordered such fruit, when it was available in the Connecticut market to competitors, but was denied to it. In fact, it even failed to sustain its burden of proof, that surplus roller fruit was available in the New York market at a time when it ordered rollers and was denied the right to purchase the same. Had the plaintiff been able to prove this latter claim, and the evidence disclosed that Fruit Dispatch provided the same availability of product and price in reasonably zoned areas to sustain the marketability of its product, such procedures could not be declared illegal, absent a showing that such practices tended to destroy competition. American Oil Company v. Federal Trade Comm'n, 325 F.2d 101 (7 Cir. 1963).

█ The plaintiff claims that the overall average price variance during the eight-month period, between the product of Fruit Dispatch and its nearest competitor, Standard Fruit and Steamship Company, averaged eighty-six cents (86¢) per hundredweight. Such a variance does not support the claim in this instance, of an operational monopoly. Admittedly, the fruit quality product of Fruit Dispatch was of superior quality.[37] During the eight-month period, the stems or bunches purchased by the broker, Kalliches, each averaged 90.8 pounds. The stems or bunches of competitive fruit purchased during that same period each averaged 67.1 pounds. The average weight per stem or bunch imported by Ecuadorian Fruit was 77.6 pounds.[38] Under these circumstances, it is to be expected that a slightly higher price would be in order for bananas of a generally superior grade, quality, and condition.[39] The percentage of shrinkage and waste in fruit imported

by companies other than United Fruit was substantially greater.[40]

This superior product did not occur by accident. It was the result of more than a half century of great human effort and investment. The defendant, United Fruit, expended many millions of dollars in research to eradicate disease, develop types of hybrid plants which would be more productive, resist weather and generally provide a more marketable product.[41]

The Gros Michel variety of bananas has a greater market acceptability over the Cavendish variety and is the type produced in greatest quantity by the defendant, United Fruit. In those areas where Panama disease, a fungus growth, strikes a plantation, the land cannot be used again to grow Gros Michel fruit; however, it will produce Cavendish. Another superior advantage enjoyed by the United Fruit product is the fact that, while other competitive companies do produce Gros Michel fruit, much of it is grown on the Western Coast of South America. This fruit has to be cut at an earlier state of development because of the long voyage through the canal to the Eastern seaboard. Much of United Fruit's Gros Michel fruit comes from the Caribbean and Central American ports, which permit its growth a greater number of days before cutting and permits delivery with a minimum of spoilage. Considering all factors and adopting the plaintiff's figures, an .0086¢ per pound variance in cost of United Fruit's product over its nearest competitor, does not in and of itself indicate a monopoly price overcharge.

█ Another factor to be considered in respect to the allegation of monopoly, is the growth status of the principal defendant, the parent company, United Fruit, during the years immediately preceding the year in question. Defendant's Exhibit 25 demonstrates that this defendant's banana sales in the United States during the year 1954, amounted to $159,-

37. Tr. 513, 978, 1155.

38. Tr. 1853.

39. Supra, note 37.

40. Tr. 1973, 1999–2000.

41. Tr. 1485–1497.

137,092.94, whereas in 1958, it had decreased to $136,599,948.91. In similar manner, the company's profits, before taxes, in the year 1954, amounted to $38,-869,611.10, whereas in 1958, they had decreased to $21,408,918.30.

In 1954, the company's profit ratio to sales, before taxes, amounted to 24.04% whereas in 1958, it was 15.07%. The company's profit percentage in relationship to net worth had decreased from 22.04% before taxes, to 13.9%. These objective financial computations are not indicative of a growing and expanding monopoly.

■ The second phase of the complaint alleges a violation of the Robinson-Patman Act, 15 U.S.C. § 13(e); the statute provides:

> "It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms."

Both parties concede that the plaintiff jobber paid to the defendant, United Fruit, ten cents (10¢) per hundredweight for loading its truck at the Weehawken truck loading shed. For an average load of 20,000 pounds, this would amount to about Twenty Dollars ($20.00). On the other hand, a jobber who purchased a freight car, containing the same number of pounds of fruit, was required to pay nothing directly to the defendant; any charges assessed were incorporated in the freight tariff rate charged by the carrier for transporting the cargo from the terminal to its destination. In this instance, the railroad reimbursed United Fruit the minimum charge of Two Dollars and Fifty Cents ($2.50) for the service of loading the car.[42] The plaintiff claims that since the defendant incurred no greater expense in loading a truck than a railroad car, and the defendant assessed nothing directly against the purchaser of the contents of the refrigerated car, the defendant was actually supplying valuable facilities or services to one purchaser, which was not accorded to others. Corn Products Refining Co. v. Federal Trade Comm'n, 324 U.S. 726, 744, 65 S.Ct. 961, 89 L.Ed. 1320 (1945); Elizabeth Arden, Inc. v. Federal Trade Commission, 156 F.2d 132 (2 Cir. 1946), cert. den. 331 U.S. 806, 67 S.Ct. 1189, 91 L.Ed. 1828 (1947).

While the plaintiff accepted its delivery of banana purchases from the defendant by truck, rather than by rail, this was a policy chosen by the plaintiff, because it was most beneficial to its own business interests. The Weehawken terminal is approximately forty (40) road miles from the plaintiff's warehouse in Stamford, Connecticut.[43] The plaintiff desired the delivery of all purchases at an early hour on the same business day. This could not be accomplished by rail because it was slower, and the plaintiff did not have a private rail facility at its ripening warehouse. Additional handling and trucking charges would also be required. In any event, it was cheaper, more convenient, and more efficient for the plaintiff to transport its fruit by truck. Several Connecticut jobbers, who had rail sidings at their warehouses, took delivery by truck for the foregoing reasons.

The Interstate Commerce Commission railroad tariff rate schedules, which incorporated the loading charge, were more expensive. Even if the plaintiff were to hire a common carrier truck rather than use its own trucking facilities, the rail expense would have been greater.[44] The plaintiff, in fact, was not discriminated against and there was no showing of competitive injury. All jobbers who transported by truck paid the same truck

---

42. Tr. 1597–1598, 1601, 1625; Defendants' Exhibits 23A, 23B and 23C.

43. Plaintiff's Exhibit C.

44. Tr. 1695, 1735, 1762.

loading charge; yet all were free to choose their mode of delivery.[45] Whether or not the plaintiff provided itself with rail siding facilities, was of no concern to the defendants. Federal Trade Comm'n v. Simplicity Pattern Co., 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959).

The Weehawken terminal was primarily designed to provide facilities for interchanging freight between vessels and railroad cars or trucks. The rental agreement between United Fruit and the New York Central Railroad provided that the former would construct the truck loading shed, scalehouse, parking areas and appurtenant facilities for the handling of bananas. The facilities were jointly used by both carriers. United Fruit paid approximately 70% of the construction costs; in addition, it was required to pay the New York Central an annual rental of $4,600 and to equip the terminal at its sole expense to handle its commodities.[46]

These circumstances, plus the added consideration, that the railroad was required to provide the defendants at all times with an adequate number of refrigerator cars, should they be needed to handle the defendants' surplus banana cargo, justified the reasonableness and legitimacy of the "quid pro quo" arrangement between United Fruit and the New York Central Railroad. The defendant had on several occasions, attempted without success, to revise upward these rail load-charges, because it was losing money on the arrangement.[47] The plaintiff has failed to prove that the defendant's truck loading charges were in fact discriminatory and in violation of the statute. The same facilities were equally available for all to choose. No injury to competition or to the public occurred because of any price discrimination.

The Court concludes that the plaintiff has failed to prove that the defendants, or either of them, have acted illegally in violation of the Anti-Trust and Price Discrimination Acts as alleged in the complaint. No right to relief in the plaintiff against said defendants or either of them exists, based on any of the counts of the complaint. Therefor, judgment shall be entered for the defendants, dismissing the complaint, with costs.

The Findings of Fact and Conclusions of Law, in accordance with Rule 52(a), Fed.R.Civ.P., are attached and incorporated herein by reference as Appendix "A".

---

45. Tr. 1705.

46. Defendants' Exhibit 43.

47. Tr. 1654–1663.