### PLASTIC PACKAGING MATE-RIALS, INC.

v.

### The DOW CHEMICAL COMPANY.

### Civ. A. No. 70–3234.

United States District Court,
E. D. Pennsylvania.

May 26, 1971.

Bancroft D. Haviland, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for plaintiff; Gerard J. St. John, Philadelphia, Pa., with him on the brief.

John G. Harkins, Jr., Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant; Barbara W. Mather, Philadelphia, Pa., with him on the brief.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

JOHN W. LORD, Jr., Chief Judge.

After a ten day hearing on plaintiff's motion for a preliminary injunction and a careful consideration of both plaintiff's and defendant's suggested findings of fact, conclusions of law and briefs, the Court makes the following:

## FINDINGS OF FACT

1. Plastic Packaging Materials, Inc. (PPMI) is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal office and place of business at 2235 North Bodine Street, Philadelphia, Pennsylvania 19133.

2. PPMI has been primarily engaged in the business of (1) buying material from the Dow Chemical Company (Dow) known as Expandable Polystyrene Strands (EPS); (2) processing it through steam heat expanders which expand the material into a loose fill type of packaging product; and (3) the sale of that product under the Dow trademark, Pelaspan-Pac, and in some cases, the sale of unexpanded EPS.

3. In December 1969, the stock of PPMI was acquired by Dimode Industries, Inc. with the knowledge and approval of Dow.

4. The Dow Chemical Company is a corporation organized and existing under the laws of the State of Delaware with a principal office and place of business at 2030 Dow Center, Midland, Michigan 48640.

5. Dow manufactures and sells, among its many products, expandable polystyrene strands and flowable material (EPS).

6. Both Dow and PPMI conduct business in interstate commerce, including specifically, the products and markets involved in this proceeding.

7. Dow sells EPS throughout the United States to a network of authorized, geographically-located converter/distributors, pursuant to distributorship sales agreements. This agreement is accompanied by a trademark licensing agreement which permits the distributor to sell the expanded EPS under the Dow trademark, Pelaspan-Pac.

8. Plaintiff has acted as a distributor of Pelaspan-Pac for Dow under successive agreements dated December 8, 1965, January 1, 1967, February 20, 1968 and November 25, 1969.

9. Under the terms of the agreements each distributor is assigned a primary geographic territory. The November, 1969 contract between Dow and PPMI, which was in effect prior to Dow's attempt to terminate, provided: "Pursuant to your appointment hereunder, you shall use your best efforts to promote the resale and distribution of products hereunder in your primary sales area." Within this area PPMI was required to meet a set amount of sales each year.

10. There is no language in the contract which expressly limits the distribution to sales within the designated "primary area" and, in fact, the use of the adjective primary, rather than sole or exclusive, implies that sales outside this area are contemplated.

11. PPMI has consistently and extensively promoted and sold EPS and Pelaspan-Pac in areas which were outside its "primary area" and within the "primary area" of other Dow distributors of Pelaspan-Pac.

12. At the time of the attempted termination, PPMI was the leading distributor of Dow EPS and Pelaspan-Pac in the United States. In 1969 PPMI's purchases of EPS from Dow constituted approximately one-third the total amount purchased by all of the Dow distributors and was about twice the amount purchased by the next leading distributor.

13. Until the end of 1967 the Plastics Department of Dow had the responsibility for the distribution of EPS. The Plastics Department did not market any other product through a network of distributors.

14. During 1967 other distributors of Pelaspan-Pac, including Mr. Roberts of Roberts Paper Co. and Mr. Scherl of Norel Paper, complained to Dow representatives about PPMI "pirating" their accounts and setting up subdistributors in their primary areas. The establishment of United Packaging as a sub-distributor in the Boston area by PPMI was one such incident.

15. On March 13, 1967, Dow informed PPMI that they had discontinued their previous practice of allowing drop-shipments, which PPMI had been utilizing in supplying United Packaging. Under this procedure Dow had been sending material directly to United Packaging under PPMI's purchase order. However, since Dow has consistently allowed PPMI to pick up EPS in its own trucks, PPMI still did not have to pay two freight costs (one to Philadelphia and then to Boston) to supply United Packaging.

16. On April 19, 1967, Mr. Garrett, the Dow salesman who serviced the PPMI account at that time, called on PPMI at Philadelphia.

16(a). The substance of this meeting was communicated by letter dated April 25, 1967, to Mr. Hornsby, Credit Manager for Molding and Extrusion Sales, which at this time was in charge of distributing EPS. Copies of this letter were also sent to Mr. Klose, District Sales Manager, and Mr. Scott, Market Manager for Pelaspan-Pac.

16(b). In response to a complaint by PPMI that Dow would not financially support their efforts in a Canton, Ohio trade show, Mr. Garrett stated that Dow encouraged concentration of promotional efforts of distributors in their immediate sales area and, that while Dow would not financially support this effort of PPMI, it was not restricting PPMI to selling only in the Philadelphia area.

17. On April 27, 1967, Mr. Garrett and Mr. Scott made a joint call on PPMI.

17(a). In preparation for this meeting Mr. Scott wrote an inter-office memorandum to Mr. Hornsby which summarized the areas which Mr. Scott felt would come up at the meeting. Most of these involved special requests for literature or financial support of their promotional activities. The memorandum concluded with Mr. Scott's evaluation that while PPMI was always asking "the unusual request which will give them an incremental edge over other distributors in the field" he could "accept these problems" as long as they continued to sell as well as they had in the past.

17(b). Mr. Garrett wrote Mr. Scott on May 5, 1967, regarding the meeting and communicated that while he thought that the meeting generally had been profitable he wanted to make sure that PPMI was not left with the impression that Dow was "openly" going to allow PPMI to set up United Packaging as a subdistributor in the Boston area.

17(c). Mr. Scott agreed with this and noted that the trade license and distributorship agreement were not transferable.

18. On August 11, 1967, Mr. Garrett visited PPMI. In a Salesman Call Report sent to Mr. Klose and Mr. Scott, Mr. Garrett reported that PPMI had approached Rock City Box's subdistributor in the upper New York State area and that he did not approve of this. At this meeting Mr. Garrett made his position quite clear to PPMI and sought "a little understanding" from the principals at PPMI regarding the fact that Rock City Box was a new distributor and therefore PPMI should not attempt to take away their subdistributors by underselling them.

19. After another meeting with PPMI during the week of August 28, 1967, Mr. Garrett reported to Mr. Klose and Mr. Scott in his salesman report that while PPMI was quite aware that Dow felt PPMI was primarily responsible for the Greater Philadelphia area and that there should be a concentration of sales effort in that area, they did not take Dow's position seriously.

20. On August 31, 1967, Mr. Scott wrote Mr. Hornsby another internal memorandum in which he enumerated the general problems associated with the PPMI account. Among those discussed were: (1) an over-aggressive marketing approach which had had a disrupting effect on the Pelaspan-Pac distributor organization; (2) a poor marketing operation; (3) allegedly misleading statements made by PPMI personnel regarding Dow policy; and (4) the fact that while PPMI was by volume one of the largest purchasers of EPS, most of it was the result of taking existing customers away from other distributors rather than generating new end users of the product. Mr. Scott recommended a meeting with PPMI at which time Dow would "explicitly" state that they had reservations about continuing the business relationship with PPMI and "implicitly" press for an immediate withdrawal of the personnel and marketing efforts from the Boston and upper New York areas. Mr. Scott called for a review of the situation two months after this meeting and if it had not improved he recommended that Dow cancel PPMI's distributorship. Mr. Scott concluded by stating "[i]n implementing this plan, we must be extremely careful of the 'anti-trust' and 'restrain (sic) of trade' legal ramifications as I am thoroughly convinced we will be sued by PPMI if a parting of the way is affected."

20(a). The notes for the final draft of this memorandum, which were not communicated to anyone, listed the alternatives available to Dow, as well as the pros and cons of each. These alternatives ranged from "do nothing" to "talk with PPMI" to "threaten PPMI" to "cancel PPMI." The second and third alternatives listed above both had the notation "have to watch legal problems" noted beside them.

21. In late October or early November Mr. Lehman, Mr. Scott's successor as Product Sales Manager for Pelaspan-

Pac, along with Mr. Garrett, visited PPMI. At this meeting Dow sought a commitment from PPMI that they would discontinue their sales efforts in the Boston and upper New York areas.

21(a). In a letter dated November 13, 1967, Mr. Lehman related to Mr. Garrett the substance of a phone conversation with Mr. Stolper of PPMI where Mr. Stolper "gave me his unqualified word that they were going to stay out of the upper New York state * * *. He said they were willing to live within their territory. * * *"

21(b). In April, 1968, Mr. Garrett wrote a report to Mr. Paul Santee, who was about to assume the responsibility of servicing the PPMI account, and stated, *inter alia*, "since December of 1967 (PPMI) has seemed to have turned a new leaf and have ceased to be a major problem in other distributor territories." A copy of this report was sent to Mr. Bader, and while he had discussed some of the problems enumerated in the report as they had come up he did not discuss the report with either Mr. Bader or Mr. Santee.

22. In January, 1968, Dow Chemical transferred the responsibility for the sales of EPS from the Plastic Division to the Packaging Division. This transfer of responsibility was completed in the Midland Office in January, 1968, and at the district level by the spring of 1968.

22(a). Mr. Bader took over from Mr. Lehman as the Product Manager for EPS. Mr. Garrett continued to service the account until June, 1968, when he was replaced by Mr. Santee, a salesman from the Packaging Division.

23. During this transitional stage the distributor contract with PPMI was renewed (February, 1968) and its "primary area" enlarged to include the New York City area.

24. At least by June, 1968, other distributors again began to complain to Dow about PPMI's activities in their areas.

25. When Mr. Bader first took over as product manager he was concerned with the complaints from distributors about the pirating of accounts by other distributors. Mr. Bader talked to his supervisor, Mr. Cummins, and the legal department about this problem. From these conversations it was made very clear to Mr. Bader that Dow could not interject itself into this problem. While this remained a problem for the field salesmen, who have the responsibility for answering distributor complaints, Mr. Bader responded to any such complaint, whether received from a salesman or another distributor, that Dow could do nothing about it; that Dow could not become involved in monitoring accounts or where people sell their goods or what price they sell them for. Dow did not relay these complaints to PPMI.

26. In the spring of 1968 Mr. Bader, in response to a complaint by International Commodor about the quality of Pelaspan-Pac which PPMI was delivering to the Memphis Supply Depot, an account they had previously serviced, sent Mr. Garrett to the depot. In a letter dated May 23, 1968, Mr. Garrett reported to Mr. Bader that a quality problem existed and that "it was obvious he (Mr. Whitehorn of the Purchasing Department) was not pleased with PPMI's service to date" and that there was cause for concern over this situation.

26(a). On May 29, 1968, Mr. Bader wrote Mr. Arthur Stolper at PPMI concerning Mr. Garrett's report. Mr. Bader emphasized Dow's extreme displeasure at PPMI sending Pelsapan-Pac which was known to be substandard in that it was only partially expanded and that Dow did not consider the rush to meet delivery dates or commitments an excuse for such action. Mr. Bader concluded by noting that in light of Dow's substantial investment in the trademark Pelaspan-Pac, an investment shared by its distributors, they were "greatly concerned" that material sent to customers under this trademark by Dow's distributors conform to the advertising and trade literature.

26(b). Mr. Marcus, a technical service representative of Dow, visited Memphis on June 6, 1968. The representatives of the procurement section (Messrs. Banks, Tuttle and Griggs) had no complaints and stated they were satisfied. Upon examination of some Pelaspan-Pac recently received from PPMI, Mr. Marcus did find material which was incompletely foamed. This condition resulted in the material having a greater density then called for by the contract. This, in turn, decreases the usefulness of the product as a packaging material and increases the cost of the material to the customer who pays the freight from the conversion point.

27. In the summer of 1968 a problem arose regarding an end user of Pelaspan-Pac in the Massachusetts area, Worthington Controls. This account had been serviced by Roberts Paper but Mr. Gray, from Stimpson, Inc., was actively attempting to acquire the account for PPMI. There was some confusion on the part of Worthington Controls as to whom they should deal with. Mr. Roberts felt that he should be designated the authorized distributor but Mr. Bader did not support him in this request. However, Mr. Bader did, at the request of Roberts Paper, telephone Worthington and told them that Dow had several authorized distributors among whom were General Box in Winchendon, Massachusetts, Roberts Paper in Rhode Island and PPMI in the New York and Philadelphia area, and that they could buy from whichever distributor they wanted. The subdistributor of PPMI who was soliciting the account, which was not an authorized distributor, was not listed.

27(a). Mr. Bader and Mr. Lehman met with PPMI in Philadelphia on July 9, 1968. The purpose of the meeting was to reconcile a claim that PPMI had lodged against Dow for faulty material. Neither warned PPMI to stay away from the Worthington account and limit its sales to its allocated territory.

27(b). On June 13, 1968, Mr. Gray wrote Mr. Stolper and informed him that Worthington had "been advised by Dow that they did not want Worthington to leave their present suppliers" and asked Mr. Stolper to get "Dow's side of the story." Mr. Stolper's reply letter, dated June 19, 1968, related what he considered to be Dow's policy regarding territories. A copy of this letter was sent to Mr. Carter who forwarded it to Mr. Bader on July 5, 1968.

27(c). On August 9, 1968, Mr. Bader wrote Mr. Stolper in an effort to clear up what he considered to be "borderline" statements regarding Dow's posture on territory considerations. After stating the basic marketing philosophy regarding the distribution of Pelaspan-Pac, that due to the lightweight, high bulk nature of the product, distributors were located in geographic areas, he stated that while Dow appoints distributors who are capable of selling and servicing their primary market, "we do not and cannot restrict any of our distributors to a specific piece of geography. It is illegal to do so, and there can be no equivocation on that point. What we logically look for you to do, is to maximize your sales efforts in your primary marketing area, for this is the basic purpose of your appointment."

28. In late November, 1968, in response to a complaint to Dow from Mr. Frati, Manager Order Processing of Bulova Watch Co. of Jackson Heights, New York, Mr. Marcus, a Dow technical representative, visited the plant. There was a problem with the flow of Pelaspan-Pac from the hoppers. Part of the material was "wet" and when Mr. Marcus discussed this with PPMI, Mr. Stolper stated that he had to ship wet due to the pressure of delivery dates.

28(a). Prior to Mr. Marcus' arrival, Bulova requested the names of other possible distributors and during the visit he indicated to Mr. Marcus that in the future he was going to split his business between PPMI and Norel Paper Co.

29. In the fall of 1969 Dow was seeking to introduce Pelaspan-Pac into the Federal Supply System through the "new item inventory schedule".

29(a). In October 1969 Dow entered into the contract to provide the end product Pelaspan-Pac because the Government Services Administration (GSA) would not enter into multiple agreements with many distributors. Dow became the prime contractor and in turn Dow's authorized distributors became subcontractors.

29(b). Individual orders were subcontracted by Dow to the distributor closest to the purchasing government agency. The reason for this was that the government had heretofore refused to pay freight on shipments and only after extensive efforts on the part of Dow did it agree to permit Dow to ship F.O.B. from the closest converting/distributing point, which would keep freight costs to a minimum.

29(c). PPMI initially voiced some concern about this procedure which they communicated to Mr. Bader in a letter dated October 21, 1969. The main concern on the part of PPMI was that it would not receive what it felt to be an adequate share of this government business due to its being located in a region which did not have many government purchasing depots. While PPMI did sign the subdistributor contract, in February, 1970, it tried to get Dow to change its form of distribution under the master contract. Mr. Stolper contacted Mr. Santee who in turn wrote Mr. Bader in an attempt to change the existing procedure. Mr. Bader replied to Mr. Santee's letter on February 11, 1970, reiterating Dow policy, and stating that he did not consider PPMI to have made a significant contribution to the utilization of the product by GSA and he would not reconsider his original decision.

29(d). Furthermore, the contract with Dow applied only to purchases from the New Item Introductory Schedule. Most governmental installations had the alternative of putting out bids for the product and PPMI could, and in fact did, bid on this business.

30. Plaintiff's distributor contract was renewed routinely as of November 25, 1969.

31. Throughout the distributorship relationship PPMI had requested amounts of free promotional literature far in excess of other distributors. Dow attempted to make available proportionally equal amounts of free copies of promotional literature to its distributors. There is no evidence that plaintiff did not get its proportionate share of free literature, nor is there any evidence that plaintiff was restrained from using that literature wherever it chose. Moreover, at all times, promotional literature could have been purchased by PPMI from Dow.

32. In early 1970 plaintiff made a substantial claim against the defendant and also became in arrears in its invoices to Dow. These two factors resulted in the business relationship between the parties becoming strained.

32(a). Dow experienced sporadic quality problems with its EPS in the last quarter of 1969, and during that period plaintiff received a substantial quantity of EPS from Dow which it could not expand properly and which it rejected. Other distributors also experienced this problem. As a complaint was received from plaintiff, Dow caused an investigation to be made of the complaint, and a report was then prepared indicating whether or not the material was satisfactory or should be returned for credit. When the material was found to be faulty, the report was followed by issuance of an authorization to plaintiff to return the material for credit. While there was a period of confusion and discussion about what had been authorized for return and what was actually returned for credit, ultimately, approximately $40,000 worth of material was returned for credit for which credit memoranda were then issued by Dow to the plaintiff.

32(b). In addition to seeking credits for return of material, plaintiff lodged a claim against Dow in early March 1970 for an additional $62,000 which it al-

leged it lost as a result of the defective material shipped to it in the latter part of 1969 and early 1970. Dow initially rejected this claim in its entirety in light of the provision in its agreement with plaintiff limiting its liability to the value of merchandise returned (and for which credits were in fact issued). Shortly thereafter Dow offered $3,500 to settle the claim.

32(c). During this period plaintiff's account became seriously overdue. While Dow did not press for payment of invoices covering material as to which it was anticipated that credits would be issued, it did begin to press plaintiff for the balance owed to Dow. By early March 1970, this balance, not including the amount of those invoices not yet overdue under Dow's thirty day terms of payment, was approximately $75,000 overdue.

32(d). There ensued a series of meetings and other communications between Dow and plaintiff concerning both the overdue invoices and the claim. In this period, Dow requested immediate payment of part of this sum and offered plaintiff a note for six months for the balance. Plaintiff made some payment of its account, but refused a six month note on the grounds it needed longer to pay the balance. One of these meetings was, by request of plaintiff, with a member of Dow's Board of Directors who also served as Director of Sales for the Company. As a result of this meeting, Dow decided to send Charles Kline to Philadelphia to conduct an independent investigation of the facts underlying the $62,000 claim in order to present a fresh appraisal of the situation to Dow's management. Mr. Kline came to Philadelphia, conducted his investigation and reported back to the Manager of the Packaging Department, Mr. Keil, that with certain exceptions, he had been unable to develop adequate support for most of the claim from plaintiff's records.

32(e). Dow then decided that its Packaging Department District Sales Manager, Mr. Carter, should meet with plaintiff to set forth Dow's position on both the overdue invoice problem and the claim. Mr. Carter called on plaintiff, on May 28, 1970, and informed plaintiff, in essence, that Dow would increase its offer in settlement of the claim to $7,000; that if this were not satisfactory to the plaintiff, it could bring suit against Dow and this alone would not be considered a reason for terminating the relationship between Dow and plaintiff; and that if plaintiff did not immediately pay up its remaining overdue invoices, Dow would place the account for collection and would make no further shipments. As a result of this meeting, plaintiff paid the rest of the overdue invoices in early June. In August 1970, plaintiff settled its claim against Dow for $7,000.

33. In May 1970, Paul M. Smith replaced James J. Bader as Product Sales Manager of Dow in charge of EPS and Pelaspan-Pac.

34. As a result of the overdue invoice problems, coupled with a continued failure by plaintiff to provide up-to-date financial data and plaintiff's apparent low net worth, Dow's Credit Department began restricting shipments to plaintiff in the spring of 1970. After the overdue invoices were paid in June, a two truckload extension of credit was granted to plaintiff. Under this arrangement, once the two truckload limitation was reached, one of the outstanding invoices would have to be paid by plaintiff before Dow would fill a new order. This arrangement made the order entering process a time consuming one for Dow personnel because of extra communications among the customer, Dow's District Office, its Credit Department, and the plant, extra paperwork and, frequently, extra time spent by the salesman in picking up checks. From this point on PPMI did keep its account current.

35. For quite sometime, Dow's personnel had found it difficult and time consuming to deal with plaintiff's personnel on other matters. Problems arising with respect to such matters as re-

quests for promotional literature, the scheduling of truck pick-ups of material by plaintiff at Dow's plant, requests for technical assistance and the like, which could have been expeditiously dealt with in a normal customer relationship, became difficult and aggravating problems in Dow's relationship with plaintiff because of the manner in which plaintiff's personnel raised and dealt with these problems. This situation, coupled with the credit restrictions, required Dow's personnel to devote a disproportionate amount of time to servicing plaintiff's account, and served to undermine Dow's confidence in the continuing value of the relationship.

36. Throughout this period PPMI continued to aggressively advertise and sell Pelaspan-Pac in territories which were not within their primary areas. Other distributors complained of PPMI's presence and price cutting tactics within their territories. Dow did not voice these complaints to PPMI and on occasion Dow informed other distributors that it could not.

37. In 1970, PPMI began to promote a piece of equipment called a Mini-expander. This piece of machinery, built by the Kohler-General Co., was a compact expander which is designed for in-plant use by large users of packaging material. Shippers using the mini-expander could purchase EPS and expand their own materials as needed. PPMI has some sort of exclusive arrangement regarding the distribution of this piece of equipment with Kohler-General.

38. On September 1, 1970, PPMI arranged to demonstrate the mini-expander at a General Services Administration facility at Franconia, Virginia.

38(a). PPMI sent many invitations throughout the country which included several Senators and Congressmen, as well as the President. The telegram to the President claimed that the Government could save "many millions of dollars in packaging costs" if it would utilize this new means of packaging. PPMI never informed Mr. Weaver, who was the GSA man in charge of the demonstration, that they were sending invitations to persons high in government circles and consequently they were not briefed by Mr. Weaver. When questions were raised along the chain of command no one really knew what the telegram or demonstration was all about. This created a very awkward and embarrassing situation for Mr. Weaver, who immediately informed Dow of this. Since Mr. Weaver was Dow's key contact in GSA and since they had spent much time concerning the acceptance of Pelaspan-Pac in terms of federal purchasing specifications with Mr. Weaver, this lack of business judgment on the part of PPMI caused much concern among Dow management.

38(b). The demonstration was successful from a technical standpoint.

39. On September 10, 1970, a group of eight distributors of Pelaspan-Pac met in Chicago. The meeting was arranged and organized by Mr. Hines, President of a West Coast distributor (Foam-Pac). Mr. Hines is also the United States machine representative for Takashima Co. of Japan. Mr. Hines called this meeting to discuss a possible alternative to the Kohler mini-expander to which, it appeared, they would not have access. Mr. Hines felt that the Japanese Company which he represented could produce such a machine as well as other equipment which the distributors of Pelaspan-Pac might find useful.

39(a). Since Mr. Hines was in effect competing with PPMI concerning a compact expander he did not invite PPMI to the meeting.

39(b). The distributors also discussed various complaints concerning Dow. One of these was whether Dow would allow PPMI to be the exclusive distributor of the Kohler mini-machine. There was some general discussion about PPMI being a "thorn in the side" to the other distributors.

39(c). Dow's general policy regarding machines for distributors of any of their products was that they did not be-

come involved in the sales of machinery even though it might be necessary in distributing the end product. The policy of the packaging department under Mr. Smith was that they preferred to evaluate and recommend various manufacturers of machinery and let the distributors make their own choice. Since Dow had not been afforded the opportunity to evaluate the Kohler mini-expander, and in keeping with this policy, Mr. Smith responded to a letter inquiring into the mini-expander that a discussion concerning it was premature at that time.

39(d). Mr. Hines informed Mr. Smith of this meeting and invited him to attend but Mr. Smith was unable to do so.

40. A few days after this meeting Mr. Smith, accompanied by Mr. Marcus of the Technical Service and Development Department, met with Mr. Hines for about two hours at the Chicago Airport. Mr. Hines was anxious to obtain from Mr. Marcus technical advice regarding the building of a small expander, which included such information as size and volume of output per hour it should be capable of handling. Mr. Hines was also interested in obtaining Mr. Smith's approval or recommendation for his compact expander and expressed the hope that Dow might aid him in marketing this piece of equipment. The various complaints regarding Dow policy voiced by the distributors at their meeting were also communicated to Mr. Smith.

40(a). On September 15, 1970, Mr. Smith, after meeting with Mr. Grenkoski, his immediate superior, dictated a memorandum in which he enumerated nine issues which Mr. Hines raised regarding Dow's policy. The mini-expander of PPMI was not included because as a machinery problem, both Mr. Grenkoski and Mr. Smith felt that other than evaluating the piece of equipment when it was made available to them, it did not involve Dow and was a problem that should be worked out among the distributors.

40(b). One of the points of concern on the part of the Dow distributors was that while they were required to purchase 100% of their requirements from Dow there was no guarantee that Dow would support their efforts and not allow other distributors to encroach on their primary territories. On October 2, 1970, Mr. Hines wrote Mr. Smith requesting him to answer the questions which were put to Dow. Due to the press of other business, which included trips to Norel Paper and Roberts Paper, Mr. Smith did not respond until November 2, 1970. In this response Mr. Smith reiterated Dow's policy that "we can in no way limit their [other distributors] selling efforts to any specific territory."

41. Meanwhile, on September 17, 1970, David Stolper, who was at the time President of PPMI, was indicted and arrested on a charge of industrial espionage involving the procurement of customer lists and other trade secrets by bribes and other means from an employee of a competitor known as Free Flow Packaging, Coatesville, Pennsylvania. The indictment and arrest were publicized in the Philadelphia newspapers and over the radio and television media.

41(a). When this information became known to Dow, it caused concern in terms of the effect that the publicity might have on customers or potential customers of Pelaspan-Pac. This incident further served to undermine confidence in this distributor.

42. On September 21, 1970, Dow's Credit Department received information from plaintiff's bank in Philadelphia, *inter alia*, that plaintiff's parent, Dimode, then had a negative net worth of approximately $1,400,000 and that plaintiff's bank was concerned about the quality of plaintiff's receivables and about its own involvement with plaintiff. This resulted in a decision to suspend further shipments to plaintiff on credit until the situation could be analyzed. At the request of Dimode, Dow agreed to accept a guarantee of plaintiff's indebtedness to Dow from a

third corporation known as C.G.A. in the amount of $25,000. On the strength of this guarantee the credit limit was again raised to two truckloads. However, Dow remained concerned about the credit-worthiness of plaintiff and its parent, Dimode. And when the guarantee was issued, it turned out to be only a thirty day guarantee, which meant it would have to be renewed every thirty days in order to continue to support plaintiff's indebtedness.

43. While there may have been some discussions concerning the desirability of retaining PPMI as a distributor prior to the arrest of David Stolper, it was this incident which triggered earnest discussions regarding the termination of PPMI.

43(a). The decision to terminate was first reached by Mr. Smith and Mr. Grenkoski who had discussed the matter with Mr. Farley of the Credit Department and Messrs. Santee and Carter of the regional office.

43(b). On or about October 9, 1970, Mr. Smith and Mr. Grenkoski recommended termination to Mr. Swayze, Marketing Manager of the Packaging Department. This decision was based on the totality of the business relationship between Dow and PPMI. Among the many factors which went into making this decision and which were communicated to Mr. Swayze were: (1) the decreasing credit worthiness of PPMI and its parent company Dimode; (2) the problem Dow had collecting payments owed by PPMI; (3) the lack of confidence in PPMI's ability or desire to deliver a quality product which conformed to the advertising claims of Pelaspan-Pac; (4) the lack of confidence in the business judgment of the individuals in control of PPMI; and (5) the arrest of David Stolper. The decision to terminate boiled down to the fact that the individuals at PPMI were, and always had been, extremely difficult and demanding people to work with on a day to day basis and this, coupled with the extraordinary time and energy which the servicing of the account required,

outweighed the positive factor that PPMI was the largest distributor of Pelaspan-Pac.

43(c). Mr. Swayze, who was also familiar with the account, agreed with Messrs. Smith and Grenkoski's recommendation and forwarded it to Mr. Keil, Manager of the Packaging Department.

43(d). Mr. Keil approved of the decision and directed it to be implemented. Both Mr. Smith and Mr. Grenkoski drafted suggested letters of termination after they reached their decision on October 9, 1970.

44. After the initial decision to terminate on October 9, 1970, but before it was finally approved and implemented on October 26, 1970, there was a meeting between Mr. Santee, Mr. Carter, the District Sales Manager for Dow, and Messrs. Speiser, Goldsmith and Arthur Stolper of PPMI. PPMI requested the meeting to see if certain problems between the parties could be resolved. While Mr. Carter knew that the termination of PPMI was under consideration, he did not communicate this to PPMI. Furthermore, he did not know that a decision had been at least tentatively reached by Mr. Smith.

44(a). Pending a report of this meeting no further action regarding the termination was taken at Midland.

44(b). At this meeting PPMI submitted a proposal which included increased sales but also required an increase in credit allowance by Dow of $40,000 over the existing $25,000 and an interim extension of the terms of payment to 75 days over the more normal 30 or 60 days. The proposal was reduced to writing and submitted to Mr. Santee on October 14. Mr. Carter forwarded this proposal to Midland where Messrs. Grenkoski, Smith and Farley analyzed the proposal and determined that rather than eliminating the current financial problems of the account, Dow would have to extend its exposure and therefore concluded that the proposal did not warrant reversing their decision to terminate.

45. After evaluating the proposal and deciding to go ahead with the termination, Mr. Smith, after consultation with Dow's legal department, drafted the notice of termination which was sent to PPMI. The legal department recommended revisions in the earlier drafts so as to set forth more completely the reasons for termination.

46. The decision by Dow to terminate PPMI was prompted by sound business judgment, and the complaints, suggestions or requests for help of other distributors arising from the Chicago meeting or raised previously played no role in this determination.

47. Under the terms of the distributorship agreement either party could cancel the agreement on thirty days' notice.

48. During the week of October 26, 1970, Dow informed its regional offices and distributors that it had terminated PPMI's distributorship and trademark license agreements.

49. After receiving notice of the termination, Mr. Arthur Stolper of PPMI contacted other distributors of Pelaspan-Pac but was unsuccessful in his attempt to arrange to purchase EPS from them.

49(a). Except with respect to Roberts Paper Co. there is no evidence presently on the record which would indicate the reasons the distributors refused to sell EPS to PPMI.

49(b). Mr. Roberts indicated that he called Dow and told them that PPMI had requested to purchase EPS from his company. Mr. Smith informed Mr. Roberts that since Dow had terminated PPMI's trademark license agreement as well as the distributorship agreement they would not allow PPMI to sell the expanded product under the tradename Pelaspan-Pac. While Mr. Roberts may have inferred that Dow did not approve of the sale of EPS to PPMI and communicated this to Mr. Stolper, no such inference was properly drawn from the conversation and may well have been used by Mr. Roberts to avoid the onus or individual responsibility for refusing to sell to PPMI. This is particularly true in light of the fact that Mr. Roberts was attempting to purchase certain of PPMI's equipment.

50. On November 2, 1970, Mr. Smith responded to the questions which had been raised by Mr. Hines. Mr. Smith indicated that changes were presently under consideration in the distributorship contracts which would alleviate some of the existing problems. These changes were discussions at Midland concerning the desirability of eliminating the "primary area" clause of the contract and not, as Mr. Roberts evidently assumed, the termination of PPMI.

50(a). The reason for the delay in responding to these inquiries was twofold: (1) the press of other business took priority over these complaints from distributors which were a "fact of life" to Mr. Smith and not deemed to be of critical importance; and (2) Mr. Hines, the originator of the inquiries, was in Japan discussing the development of a compact expander until November 2, 1970.

51. Pelaspan-Pac is a loose fill packaging material made from a polystyrene raw material base which is processed by the distributors through steam heat expanders to form the end product.

52. While certain advantages are claimed by Dow for Pelaspan-Pac, this packaging material presently competes with 6 or 7 other producers of expanded polystyrene packaging material. Pelaspan-Pac also competes with other types of loose fill packaging material such as excelsior, rubberized hair and cut straw, and may, to a lesser degree compete with non-loose fill packaging materials.

## DISCUSSION

This action arises out of the attempt by the defendant, Dow Chemical Company, to terminate the distributor and trademark licensing agreements with the plaintiff, Plastic Packaging Materials, Inc. PPMI is one of Dow's distributors

of Pelaspan-Pac, a loose fill packaging material made of expanded polystyrene. Two days prior to the effective date of the notice of termination, plaintiff filed this suit and charged Dow with violating both sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2. On November 24, 1970, this Court granted a temporary restraining order which has the effect of suspending the termination and requiring the defendant to continue to deal with the plaintiff. Presently before the Court for determination is plaintiff's request for a preliminary injunction. Beginning January 4, 1971, evidence was presented on this matter in a ten-day hearing before Chief Judge John W. Lord, Jr.

Before a court will grant the extraordinary remedy of a preliminary injunction it is necessary for the moving party to demonstrate (1) that it will suffer irreparable injury if the motion is denied; and (2) that it stands a reasonable likelihood of prevailing at the trial on the merits. Kontes Glass Co. v. Lab Glass, Inc., 373 F.2d 319 (3rd Cir. 1967); Instant Delivery Corp. v. City Stores Co., 284 F.Supp. 941 (E.D.Pa.1968). Plaintiff proffers three theories of liability under section 1 of the Sherman Act: (1) that Dow, the manufacturer, unilaterally attempted to control the distribution of their product through exclusive territorial distributorships; (2) that Dow conspired with other distributors of Pelaspan-Pac, the end product in question, to maintain the alleged exclusive territorial arrangements; and (3) that Dow conspired with the other distributors to prevent PPMI from acquiring Pelaspan-Pac after the termination. PPMI asserts that the termination of its distributorship and the trademark licensing agreements was made pursuant to and in furtherance of the illegal acts described above. Futhermore, PPMI asserts that expanded polystyrene like Pelaspan-Pac constitutes a relevant market separate and apart from other loose fill packaging material and as such Dow has a monopoly in this market and their refusal to deal with PPMI constitutes a

violation of section 2 of the Sherman Act. Dow, on the other hand, contends that they terminated the distributorship for sound business reasons which did not involve any attempt on their part, either unilaterally or in concert with other distributors, to restrict the sales of PPMI to an exclusive territory.

 The issue under section 1 which must be decided is whether plaintiff has shown that it has a reasonable likelihood of demonstrating at the trial that the termination was made in furtherance of Dow's attempt, either unilaterally or by means of a conspiracy, to restrict the sale of Pelaspan-Pac by their distributors to an exclusive territory. It may also be helpful to note that the issue is not whether this Court, given the facts and circumstances present in the instant case, would have reached the same decision that Dow did, that is, to terminate PPMI.

 The law with regard to unilateral refusals to deal is quite clear in that a manufacturer of a product which has readily available competitive products in the market, absent an anticompetitive motive, has the right to select the parties with whom it will deal. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); Cf. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); Carbon Steel Products Corp. v. Alan Wood Steel Co., 289 F.Supp. 584 (S.D.N.Y.1968). However, once a manufacturer of a product chooses to deal with a distributor and relinquishes title, dominion, or risk of the product, it may not restrict the territories or persons to whom the distributor may resell the product without violating section 1 of the Sherman Act. Such activity has been held to constitute a *per se* violation of that section. United States v. Arnold, Schwinn & Co., *supra*. Mere references or descriptions of a primary area, like that found in the instant contract, however, do not necessarily imply a *per se* violation. *See* Janel Sales Corp. v. Lanvin Parfums, Inc., 396 F.2d 398 (2nd

Cir.), cert. denied, 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968).

In its discussion the Court does not propose to relate each fact relied on by the parties. However, the Court will highlight certain of the facts which the Court finds to be of particular significance. In support of their claim of unilateral action on the part of Dow to restrict their distributors to an exclusive territory, PPMI relies heavily on a series of events which took place in the late summer and early fall of 1967. Briefly stated the facts are that several New England distributors of Pelaspan-Pac had complained to Dow regarding the pirating of their accounts and the establishment of subdistributors by PPMI in their primary areas. It is clear that Mr. Garrett, the Dow salesman who serviced the account, did not approve of these extraterritorial activities, informed PPMI of his disapproval, and sought some understanding from PPMI that it would discontinue these practices. In late August Mr. Scott, the Market Manager for Pelaspan-Pac, wrote Mr. Hornsby, the Credit Manager for Molding and Extrusion Sales, which until January 1968 was in charge of distributing the product, and suggested a meeting with PPMI at which time they would "explicitly" state their reservations about continuing PPMI as a distributor and "implicitly" press for a withdrawal of personnel and marketing efforts from the upper New York and New England areas. In late October or early November such a meeting was arranged between PPMI and Mr. Lehman, Mr. Scott's successor, and Mr. Garrett. At this meeting Dow sought a commitment from PPMI that they would discontinue their marketing efforts in the upper New York area so that the new distributor would be able to establish itself. As a result of this pressure Mr. Stolper contacted Mr. Smith by phone and stated he would abide by Dow's "suggestions." If PPMI had refused and Dow had terminated at this point it seems likely that the Court would have granted the preliminary injunction.

However, over three years elapsed before Dow terminated PPMI and during almost all of this period PPMI continued their practice of obtaining most of their business by severe price cutting and pirating of accounts in areas outside their primary territory, rather than the procurement of new end users. The Court finds that PPMI has not demonstrated a sufficient nexus between the 1967 events and the 1970 termination to warrant the granting of the requested relief. In reaching this conclusion the Court rejects plaintiff's proposition that the letter from Mr. Scott to Mr. Hornsby, including the notes which served as a rough draft, constituted a plan of action which was consistently pursued during the next three years and finally resulted in the termination of PPMI.

The other major evidence submitted in support of the position that Dow unilaterally attempted to enforce a system of exclusive territories was the 1969 Government Services Administration (GSA) contract. The Court has made it quite clear in its findings of fact that the method of distribution by Dow, with the distributor closest to the purchasing agency supplying the Pelaspan-Pac, was a result of the Government's natural demand that the freight costs be kept at a minimum, and not by any effort on their part to maintain territorial exclusivity among its distributors. By finding that Dow has not acted unilaterally in such a way as to violate section 1 of the Sherman Act, the Court wishes to reiterate that it is only determining that plaintiff has not persuaded the Court that they stand a reasonable likelihood of proving this allegation at the trial on the merits.

PPMI further alleges that Dow conspired with the other distributors of Pelaspan-Pac to maintain exclusive territories. There is no dispute that such activity would violate section 1 of the Sherman Act. Moreover, it is clear that direct proof of a conspiracy is seldom available and therefore most often must be proved by circumstantial evidence. Girardi v. Gates Rubber Co. Sales Division, Inc., 325 F.2d 196, 200, fn. 9 (9th

Cir. 1963) quoting Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 612, 34 S.Ct. 951, 58 L.Ed. 1490 (1914).

Plaintiff relies to some extent on the fact that during 1968 Dow contacted or sent technical representatives to several of their accounts, Memphis Supply Co., Worthington Controls and Bulova Watch Co., as a result of complaints regarding the quality of Pelaspan-Pac from distributors who had serviced the account prior to PPMI acquiring the business. Plaintiff would have the Court draw the inference that the purpose for which Dow sent these representatives was to reacquire the account for the original distributor, and thereby enforce the territorial integrity of each distributor. However, the Court does not find this to be the case. Rather we find that regardless of the origin of the complaints, Dow, as the holder of the trademark license, had an interest in the marketing of Pelaspan-Pac and the right to investigate reports of inferior quality material being sold under that trademark. *See* Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir.), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1969). Moreover, these service calls revealed that there were some quality problems regarding the shipment by PPMI of partially foamed material. The fact that a particular end user of the product was satisfied even though the product was not conforming to the contract specifications does not, in the Court's opinion run counter to such a finding.

Plaintiff's main support for the conspiracy charge is the meeting of eight other distributors of Pelaspan-Pac in Chicago in early September, 1970. While no Dow representative was present at the meeting, Mr. Smith had been invited to attend. Several days after this meeting Mr. Smith and Mr. Marcus from the Technical Service and Development Department met with Mr. Hines who had organized the meeting. Plaintiff asserts that the principal purpose of the meeting was to take steps to curb PPMI's extraterritorial activity. However, the Court finds that the primary purpose was an attempt on the part of Mr. Hines to interest other distributors in purchasing a machine from his company which would compete with PPMI's mini-expander. Mr. Hines, in addition to being a Dow distributor, was a machine representative for the Takashima Co. of Japan. While it is undoubtedly true that once convened some of the distributors discussed PPMI as the proverbial "thorn in the side" this does not, in the opinion of the Court, constitute a sufficient basis for characterizing this as a "clandestine meeting of the Chicago 8" designed to bring about the termination of PPMI, with Dow as a silent but active partner. The fact that PPMI was not invited is not remarkable because the primary topic of the meeting was the introduction of a compact expander which would compete with the mini-expander over which PPMI had exclusive rights.

The group also raised certain questions regarding Dow policy, including their concern that while they were required to purchase their material from Dow there was no corresponding duty on Dow to help maintain the integrity of their territory. These questions were communicated to Mr. Smith at the meeting with Mr. Hines a few days after the distributors meeting. Mr. Smith responded to this inquiry "we can in no way limit their (other distributors) selling efforts to any specific territory." Plaintiff contends that since this reply was not made until shortly after the notice of termination was sent the real answer to this inquiry was the termination of PPMI. We cannot agree with this conclusion. Mr. Smith testified that the press of other work, the fact that distributor complaints were commonplace, and the fact that Mr. Hines was in Japan till the early part of November, all contributed to the delay in his answering the inquiries.

Plaintiff has cited to the Court the case of Girardi v. Gates Rubber Co. Sales Division, Inc., 325 F.2d 196 (9th

Cir. 1963). In this case the circuit court, in reversing the district court's dismissal of plaintiff's action, stated that a conspiracy could be inferred from the facts that other distributors complained to the manufacturer about plaintiff's activities and there was an internal memorandum commenting on them.[1] It should be noted that the *Girardi* case involved price fixing, not the establishment of exclusive territories. However, the Court need not decide whether, as plaintiff contends, this case is applicable, since even if the Court applied it we would not grant the preliminary injunction based on a theory of conspiracy to restrict territories. As this Court noted, the procedural posture of the *Girardi* case was that the district court had, after the plaintiff's presentation of his evidence granted defendant's motion to dismiss. The circuit court specifically noted that in considering whether or not the evidence was sufficient to go to the jury they were required to view the evidence in the light most favorable to the plaintiff and give the plaintiff the benefit of all inferences which the record could support. This is far from the standard which this Court is called upon to utilize in deciding this motion for preliminary injunction. In this case the Court is deciding whether plaintiff has demonstrated that it has a reasonable likelihood of prevailing at the trial on the merits. There is a great disparity between the quantity of proof required to succeed in a motion for a preliminary injunction and that needed to overcome a motion for a directed verdict. We do not find that plaintiff has met this more stringent burden.

 Furthermore, complaints by distributors about competing distributors are normal in the course of business, and are by themselves not sufficient to imply a conspiracy. The spector of a conspiracy arises when the manufacturer contacts the distributor com-

plained of and "advises" him regarding his course of conduct. The manufacturer must go beyond the mere announcement of a policy and supplement it by some means designed to enforce the policy. Interphoto Corp. v. Minolta Corp., 295 F.Supp. 711 (S.D.N.Y.), aff'd, 417 F.2d 621 (2nd Cir. 1969); Carbon Steel Products Corp. v. Alan Wood Steel Co., 289 F.Supp. 584 (S.D.N.Y.1968). We find that Dow had an announced policy of allocating to their distributors of Pelaspan-Pac primary areas, not exclusive areas, and that the termination of PPMI was not an attempt by Dow to enforce territorial exclusivity.

 Plaintiff's third theory in support of their contention that Dow violated section 1 of the Sherman Act is that Dow, in combination with its other distributors, engaged in a group boycott which prevented them from acquiring Pelaspan-Pac from any source. It is clear that group boycotts or concerted refusals to deal constitute a violation of section 1. In Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), the Supreme Court held that the requisite injury to the public might be found in denying one merchant access to goods which would preclude him from competing.

Plaintiff's support for this contention is limited to the testimony of Mr. Stolper, Mr. Smith, and Mr. Roberts, whose deposition was read into the record. Except for the testimony of Mr. Roberts who is a distributor, there is no evidence which explains the reason why the other distributors refused to sell Pelaspan-Pac to PPMI. The Court will not review what it has found to be the facts (see finding of fact 49). It is sufficient to state that in the opinion of the Court, Mr. Roberts' testimony, which is the only evidence which supports PPMI's claim, is not a sufficient basis from which to conclude that all of the distributors acted in concert, at Dow's urging,

---

1. It should also be noted that while the internal memorandum in the *Girardi* case was written only three months prior to the termination, the memorandum in the instant case was drafted three years prior to PPMI's termination.

to deny PPMI access to Pelaspan-Pac. This is particularly true in light of the personal benefit Mr. Roberts stood to gain by avoiding the individual responsibility for not selling to PPMI and the specific denial by Mr. Smith that he told Mr. Roberts not to sell to PPMI.

█ In order for the plaintiff to prevail on the theory that Dow has violated section 2 of the Sherman Act, PPMI must show that they have a reasonable likelihood of proving (1) that Dow possesses monopoly power in a relevant market; and (2) that Dow willfully obtained or maintained the power rather than it having developed as a result of a superior product, business acumen or historic accident. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). In determining the relevant market it is necessary to identify it both in terms of product affect and geographic area. In the instant case there is no doubt that the relevant geographic market is national. The identification of the relevant product market is more complex. The relevant market is generally defined as that market in which the product competes; that is the market is composed of products that have reasonable interchangeability for the purposes for which they are produced. United States v. E. I. duPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). To meet the test of reasonable interchangeability it is clear that the product need not be fungible but it must be something narrower than the infinite range of possible substitutes.

PPMI asserts that the relevant market for Pelaspan-Pac is expanded polystyrene loose fill cushioning material. Dow claims a much broader market which includes at least all types of loose fill packaging material. It is sufficient for the purpose of deciding the instant motion that the Court finds that the plaintiff has not, and we feel by a substantial degree, met its burden of showing that the relevant market is the one that they claim. See United States v. Chas. Pfizer & Co., 246 F.Supp. 464 (E.

D.N.Y.1965) where the court dismissed the action because the government failed to meet its burden of showing the relevant market. Mr. Bader, who was Product Manager for Pelaspan-Pac from 1968 to May of 1970, was the only witness who testified at any length regarding the relevant market. Mr. Bader testified on direct examination that in 1968 Dow estimated the market consisted of about 100 million pounds of cushioning material of which 50 million was loose fill and 50 million mold or foam. He further enumerated several kinds of loose fill cushioning material which are available on the market such as cut paper straw, excelsior or shredded wood, cellulose wadding, and rubberized hair. Moreover, Mr. Bader testified that there are probably 6 or 7 manufacturers other than Dow who now produce expanded polystyrene loose fill packaging which have the precise type of end use application as Pelaspan-Pac. The plaintiff's evidence on this subject really amounted to no more than the cross-examination of Mr. Bader, the effect of which was to show that the figures which he utilized were, as he had testified, estimates and not the result of a formal market study.

While we need not decide the issue, it would appear to the Court from the testimony presented during the hearing that the relevant market is loose fill packaging or cushioning material. Mr. Bader stated "We addressed ourselves to all of the cushioning market that I described [the expanded polystyrene as well as excelsior, rubber hair, etc.] * * * because our product, in truth, did compete. Many times we replaced or supplanted excelsior or shredded news, let's say. At other times we were competing against flowable-type products. Cushion wraps, we replaced cushion wraps. They replaced us. These were all different choices of manufacturers in terms of cushion value, degree of protection a product can afford, its appearance, its ease of use, its density, its weight, its basic cost, the economics. There are so many factors that are involved in the case of cushioning packag-

**230**

ing material that we were head-to-head against all of these people in a whole spectrum of industry markets day in and day out." N.T. 9–160.

The Court will not belabor this issue anymore except to state that we also find that plaintiff has not met its burden of showing that even if we accept their statement of relevant market, that Dow has monopoly power within it or the additional necessary element of deliberateness. United Banana Co. v. United Fruit Co., 245 F.Supp. 161 (D. Conn.1965), aff'd per curiam, 362 F.2d 849 (2nd Cir. 1966); Union Leader Corp. v. Newspapers of New England, Inc., 180 F.Supp. 125 (D.Mass.1959), rev'd in part and aff'd in part, 284 F.2d 582 (1st Cir. 1960), cert. denied, 365 U. S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961).

PPMI also asserts that EPS constitutes a separate, relevant market over which Dow has 100% control, and that this monopoly, coupled with the territorial restrictions alleged in violation of section 1, constitute a violation of section 2. Without pausing to comment on the somewhat questionable merits that EPS constitutes a separate and distinct relevant market from Pelaspan-Pac, the Court, by its earlier finding that plaintiff has not demonstrated a reasonable likelihood of proving that Dow violated section 1, renders plaintiff's argument unmeritorious.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter of the complaint as well as jurisdiction over the parties.

2. Plaintiff, PPMI, has not shown that it has a reasonable likelihood that it will be able to prove at the trial on the merits that the termination of PPMI as a distributor by Dow was made pursuant to a unilateral effort on the part of Dow to enforce territorial exclusivity.

3. PPMI has not demonstrated a reasonable likelihood of prevailing on their contention that Dow's decision to terminate was influenced by the complaints or requests of other distributors and was made pursuant to or in furtherance of a conspiracy with these distributors to enforce exclusive territories.

4. Plaintiff has not shown that it has a reasonable likelihood of proving at the trial that the other distributors, at the insistence of Dow, boycotted or collectively refused to sell Pelaspan-Pac to PPMI.

5. PPMI has not demonstrated that the relevant market for Pelaspan-Pac is limited to expanded polystyrene loose fill packaging.

6. Since the Court has found that plaintiff has not shown a reasonable likelihood of prevailing on the merits at the trial, the Court does not reach the issue of irreparable harm.

7. Plaintiff is not entitled to the issuance of a preliminary injunction.